IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR MANATEE COUNTY, FLORIDA

CRMSUITE CORPORATION,
a Florida corporation,

    Plaintiff,

v.                                                   Case No.

GENERAL MOTORS COMPANY,         Division:
a Delaware corporation; AQUENT, LLC,
a Delaware limited liability company; and
AQUENT, INC., a Massachusetts
corporation;

    Defendants,

_____/

## COMPLAINT

Plaintiff, CRMSuite Corporation ("CRMSuite"), sues Defendants, General Motors Company, a Delaware corporation ("General Motors"); Aquent, LLC, a Delaware limited liability company ("Aquent LLC); and Aquent, Inc., a Massachusetts corporation ("Aquent, Inc.) (collectively, the "Defendants") and in support thereof states as follows:

### JURISDICTION AND VENUE

1.     CRMSuite is a Florida corporation with its principal office located in Sarasota County, Florida.

2.     General Motors is a Delaware corporation doing business in Florida.

3.     Aquent, Inc. is a Massachusetts corporation doing business in Florida.

4.     Aquent, LLC is a Massachusetts entity doing business in Florida.

5.     This Court has jurisdiction over this matter because the amount in controversy exceeds $30,000, exclusive of interest and costs.

6. Venue in this Court is appropriate as it is the Circuit Court in where the causes of action accrued, including the claims subject to Fla. Stat. § 542.30.

7. All conditions precedent to maintaining this suit have been met or otherwise waived.

8. CRMSuite has retained the undersigned attorneys and is responsible for the reasonable fees associated with the legal services rendered in this action.

## FACTUAL BACKGROUND

9. CRMSuite is a Sarasota based business that provides customer relationship management (CRM) software to automobile dealers. The CRM software allows auto dealers to seamlessly and efficiently manage their customer leads and marketing needs, including leads generated through their websites. CRMSuite has automobile dealer customers in all the major brands of manufactured vehicles.

10. Many of CRMSuite's customers are multi-manufacturer brand dealerships. These customers use the same CRM software to support their sales and marketing efforts at many, if not all, of their dealerships regardless of brand. Several of CRMSuite's multiple brand customers and prospects have some General Motors stores as part of their dealership portfolio.

11. Aquent LLC and Aquent, Inc. (collectively "Aquent") are staffing services that provide employees, on short term and long term projects, to various companies. Part of Aquent's focus is staffing technology employees with major companies including Apple, Texas Instruments, Uber Eats and General Motors.

12. Anthony Fava, an Aquent employee, is the Sales and Lead Management Program manager at General Motors. He has a General Motors email address, Anthony.fava@gm.com and his desk is located at the General Motors offices in the Renaissance Center in Detroit, Michigan.

13. Aquent has an interest in providing leased employees to companies, particularly to assist companies in the technology development efforts. Such companies include companies that provide CRM technologies to companies, including auto dealerships.

14. General Motors adopted a Winning with Integrity tagline to describe its Code of Conduct in approximately 2018. As part of that code, General Motors pledged to maintain ethical relationships with third parties, practice due diligence, and treat third parties fairly.

15. As set forth more fully below, General Motors did not live up to its own Code of Conduct in its dealing with CRMSuite as General Motors and Aquent engaged in anti-competitive conduct, unfair competition, unfair trade practices, and tortiously interfered with CRMSuite's relationships and contracts with auto dealers.

16. For General Motors, this conduct has been part of an unfortunate history of unsavory and illegal business practices.

17. In early 2014, General Motors announced that it was recalling hundreds of thousands of its vehicles due to a faulty ignition switch. The Justice Department and Congress initiated separate investigations when it became apparent that General Motors had delayed addressing the problem even though it was responsible for 13 deaths. General Motors was even fined for failing to cooperate fully in the investigation of the defect by the National Highway Traffic Safety Administration. The NHTSA subsequently fined General Motors $35,000,000.00 for failing to timely report the ignition switch defect.

18. Ultimately, in September 2015, General Motors entered into a deferred prosecution agreement with the United States Justice Department and paid a $900,000,000.00 fine to resolve criminal charges concerning the ignition switch defect.

19. Thereafter, in May 2016, General Motors announced that 135,000 SUVs were sold to consumers with window stickers that overstated the vehicles' gas mileage.

20. In December 2016, General Motors joint venture with China's SAIC Motors was fined approximately $29,000,000.00 for monopolistic pricing behavior.

21. Notwithstanding these past transgressions, fines and public proclamations of contrition, General Motors, now in concert with Aquent, has engaged in anticompetitive conduct which will reduce the number of CRM suppliers artificially, will result in higher prices to auto dealers, and is being accomplished by illegal, unfair, tortious conduct.

22. Up to and including 2019, CRMSuite owned and provided a CRM software product called AutoBase. This product was hosted on a platform owned by Dominion Dealer Services ("Dominion"). Dominion provided marketing services to CRMSuite, including the sales efforts for CRMSuite's next generation CRM software, Vision.

23. At all times material hereto, the AutoBase software has been certified by General Motors for use by General Motors auto dealers.

24. In 2019, CRMSuite undertook the process, at an expense which would exceed $300,000.00, of integrating its next generation Vision software into the General Motors system for purposes of certifying this new software product. Throughout this process, CRMSuite employees worked directly with General Motors employees and Anthony Fava of Aquent.

25. For example, Mr. Fava on November 12, 2019 emailed Patrick Geddie of CRMSuite, congratulating him on completing a phase of the development and validation of a portion of the Vision product, which Mr. Fava noted was intended to replace the AutoBase product.

26. CRMSuite and General Motors, through Mr. Fava and Aquent, scheduled the completion of the integration of the Vision software and certification by General Motors. This

final step was scheduled to take place during the first full week of February, 2020. CRMSuite was ready, willing and able to perform and complete the project.

27. Prior to February 2020, Dominion and CRMSuite negotiated and agreed, on an amicable basis, to end their relationship as Dominion's marketing efforts were not as successful as the parties expected and CRMSuite had viable alternatives for the hosting of its software.

28. Dominion is a much larger company than CRMSuite and provides a broad array of services to the automotive industry other than CRM services. Dominion did not own either the AutoBase or the Vision software, which at all times have been owned by CRMSuite.

29. Without explanation, General Motors ceased all communications with CRMSuite. CRMSuite did not immediately recognize that General Motors' efforts in this regard were spearheaded by a third-party company, Aquent, that had a vested interest in providing staffing services to large companies for their technology needs, including services relating to automotive marketing and CRM.

30. General Motors and Aquent set out on an aggressive campaign to destroy CRMSuite's customer relationships with auto dealers who sold General Motors vehicles.

31. General Motors and Aquent told auto dealers that, if they did not cancel their contracts with CRMSuite, or otherwise terminate their relationship with CRMSuite, the auto dealers would be subjected to punitive measures including having their performance bonuses withheld by General Motors and having access to leads received through their own websites – which the dealers had paid to develop – withheld as they were first channeled through the General Motors technology system.

32. During this effort to force auto dealers to terminate their contracts and relationships with CRMSuite, General Motors and Aquent involved Dominion in their efforts, first requiring

Dominion to send correspondence to CRMSuite's dealer clients and then later to participate in phone calls from General Motors and Aquent to CRMSuite's clients. As part of Dominion's agreement with CRMSuite, Dominion had in fact agreed that it would assist CRMSuite in any necessary transition by the dealers as a result of Dominion and CRMSuite ending their formal relationship.

33. In an attempt to avoid further dispute and substantial damages, CRMSuite sent correspondence to General Motors' General Counsel on February 20, 2020. (Exh. A). General Motors did not reply until 7 days later, on February 27, 2020, even as General Motors and Aquent increased their pressure on dealers to terminate CRMSuite and use another CRM provider, which would come at substantial expense to the dealers for the switch and would be priced substantially higher than CRMSuite's charges.

34. When General Motors finally responded, they did so in a way that smacks of deception and cover up. Apparently not aware that Anthony Fava had written CRMSuite on November 12, 2019 acknowledging that CRMSuite's Vision software would replace AutoBase, counsel for General Motors claimed that nothing had occurred other than Dominion notifying General Motors that it would cease offering AutoBase on March 31, 2020 and "General Motors simply advised certain dealers of that fact and the need to obtain a replacement product." (Exh. B). To date, General Motors and Aquent continue to solicit, demand and threaten dealers to force them to terminate their relationships with CRMSuite.

### COUNT I
### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

35. CRMSuite incorporates paragraphs 1 through 34 as though fully set forth herein.

36. This is an action by CRMSuite for violation of the Florida Deceptive and Unfair Trade Practices Act against Defendants.

37. Florida law prohibits unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce.

38. Defendants, by their actions set forth above, have engaged in unconscionable acts and practices in the conduct of trade and commerce by, inter alia:

   a. Threatening to withhold earned performance bonuses from General Motors auto dealers unless they terminate their contracts with Plaintiff;

   b. Threatening to withhold leads generated through the General Motors auto dealers web sites – which are captured by Defendants – unless they terminate their contracts with Plaintiff;

   c. Requiring Dominion to participate in notices of termination of services to General Motors auto dealers even though the CRM services which had been provided by CRMSuite were in fact intended by Dominion and CRMSuite to continue uninterrupted;

   d. Refusing to communicate with Plaintiff in any manner from February 2020 forward after Defendants' personnel had communicated directly with Plaintiffs' employees for months in the process of developing and testing a next generation CRM product designed by Plaintiff – at hundreds of thousands of dollars expense to Plaintiff – as Defendants made the calculated decision to refuse to allow Plaintiff to complete the last testing scheduled for the first week of February as they set out to destroy Plaintiff's relationships and contracts with General Motors auto dealers.

   e. Interfering with Plaintiff's contracts with General Motors auto dealers with the result that the dealers are required to do business with Plaintiff's competitors who

       in many instances charge dealers two to three times as much for the services provided by Plaintiff.

    f. Providing Plaintiff's customer information to Plaintiff's competitors to assist said competitors in soliciting CRM contracts with said customers.

39. As a result of Defendants' unfair, deceptive and unconscionable actions, Plaintiff has been injured.

WHEREFORE, Plaintiff requests a declaration that Defendants' above-described actions violate Florida's Deceptive and Unfair Trade Practices Act and that Defendants be enjoined from continuing this conduct, that Plaintiff be awarded damages, punitive damages, the costs of this action, attorneys' fees, and such other and further relief as this Court deems just and proper.

## COUNT II
## TORTIOUS INTERFERENCE

40. Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 34 as though fully set forth herein.

41. This is an action by CRMSuite against Defendants for tortious interference.

42. Plaintiff is engaged in advantageous business relationships and prospective relationships with auto dealers under which it has legal rights.

43. Plaintiff also has an agreement with Dominion that was designed to protect both Plaintiff and Dominion as Plaintiff transitioned away from the Dominion hosting services previously provided for Plaintiff's CRM products.

44. Defendants knew of these advantageous business relationships and prospective business relationships and engaged in acts to intentionally and unjustifiably interfere with the same.

45. Plaintiff has been damaged as a result of the aforementioned acts of Defendants.

E-Filed with MCCC - 2020CA000938AX- 3/3/2020 5:18 PM - PG 8 of 12

WHEREFORE, Plaintiff demands judgment for damages against Defendants, punitive damages, interest, and the costs of this action and any and all such further relief as this court may deem just and proper.

## COUNT III
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

46. Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 34 as though fully set forth herein.

47. This is an action by CRMSuite against General Motors for breach of the covenant of good faith and fair dealing.

48. Plaintiff and Defendant General Motors had a business relationship in which Plaintiff provided a CRM software product, which was hosted on Dominion's server, to assist General Motors dealers to receive and process leads and manage customer relationships.

49. In 2019, Plaintiff developed a new CRM product, Vision, that was designed to improve the services offered through Plaintiff's existing product, AutoBase.

50. Plaintiff's AutoBase product is owned by Plaintiff and has been hosted by Dominion for the benefit of Plaintiff, General Motors, auto dealers and Dominion.

51. When CRMSuite developed Vision, it undertook at great expense to integrate and test its product with the General Motors systems in order to secure General Motors certification.

52. CRMSuite timely and successfully completed each step of the testing and integration process until General Motors without explanation stopped communicating with CRMSuite in February 2020, when the final testing had been scheduled.

53. There was no justification or explanation offered by General Motors for suspending the progress of the testing and integration. Ultimately, rather than communicating with Plaintiff

and completing the process, General Motors instead began contacting dealers to tell them to break their contracts with CRMSuite and contract with Plaintiff's competitors.

54. General Motors legal staff, on February 27, 2020, attempted to characterize General Motors' actions as simply notifying certain dealers – that would be Plaintiff's customers – that Dominion's Autobase product was not going to be available beyond March 31, 2020 and these dealers needed to find an alternative CRM provider. This statement was demonstrably false in several respects.

55. On November 12, 2019, Anthony Fava wrote to Patrick Geddie of CRMSuite that the development of the DEALER CRM LEADS portion of Vision "is complete" and that Geddie could turn his attention to other matters as part of the "replacement of the Dominion AutoBase product." Thus, it was clear in November 2019 that General Motors was working directly with CRMSuite on the integration of Vision and that Vision was going to replace AutoBase.

56. Once General Motors undertook the process of testing and integrating Vision directly with Plaintiff, to Plaintiff's substantial financial detriment, General Motors was subject to a contractual obligation to complete its promise to fairly integrate the Vision product for use by General Motors dealers unless and until Plaintiff failed to perform its obligations in the testing process.

57. At all times material, Plaintiff performed its obligations in the testing and integration process for certification of the Vision CRM product by General Motors for use by General Motors dealers who were currently Plaintiff's customers, as well as other dealers who Plaintiff was recruiting.

58. There was an implied covenant between General Motors and Plaintiff that both sides would conduct themselves in good faith and with fair dealing.

59. General Motors has violated this implied covenant of good faith and fair dealing by, without any justification, refusing to complete the certification process with Plaintiff, using threats and intimidation to attempt to force dealers to break contracts with Plaintiff and giving information about Plaintiff's customers to Plaintiff's competitors so that these competitors could solicit Plaintiff's customers.

60. As a result of General Motors' actions, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment for damages, for lost profits, for consequential damages, and for such other and further relief as the Court deems just and proper.

## COUNT IV
## VIOLATION OF THE FLORIDA ANTITRUST ACT

61. Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 34 as if fully set forth herein.

62. This is an action by CRMSuite for damages and injunctive relief for violation of Chapter 542, Florida Statutes, including specifically §§542.18, 542.19 and 548.22 against Defendants.

63. Defendants' actions described above have unlawfully affected trade in Florida because the actions are anti-competitive, the actions seek to eliminate a competitor from a limited field of competitors, the actions include illegal tying arrangements, as well as a group boycott, and the actions have resulted in auto dealers being charged much higher prices for CRM services that are otherwise available from Plaintiff, including auto dealers who have been Plaintiff's long time customers.

64. Defendants' actions have caused willing customers to be unable to use Plaintiff's CRM product due to the refusal to provide certification to Plaintiff's product, the threats to auto

E-Filed with MCCC - 2020CA000938AX- 3/3/2020 5:18 PM - PG 11 of 12

dealers to withhold unrelated earned performance bonuses, and the threat to withhold leads generated through the dealers' own websites.

65. As a result of Defendants' actions, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment for damages, including lost profits, treble damages pursuant to Fla. Stat. § 542.22, injunctive relief, attorneys' fees incurred in the prosecution of this action, costs, and such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

CRMSuite demands a jury trial on all issues herein triable by jury.

Dated: March 3, 2020.

Respectfully submitted,

*/s/ John E. Johnson*
JOHN E. JOHNSON
Florida Bar No. 593000
jjohnson@jclaw.com
**JOHNSON, CASSIDY, NEWLON & DECORT, P.A.**
2802 N. Howard Avenue
Tampa, Florida 33607
Telephone: (813) 699-4859
Facsimile:  (813) 235-0462
*Attorneys for Plaintiff, CRMSuite Corporation*