# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CRMSUITE CORPORATION, a
Florida corporation,

       Plaintiff,

                                 Case No: 8:20-cv-00762-WFJ-AAS

v.

GENERAL MOTORS COMPANY, a
Delaware corporation, GENERAL
MOTORS, LLC, a Delaware limited liability
company, AQUENT, LLC, a Delaware
limited liability company; and AQUENT,
INC., a Massachusetts corporation,

       Defendants.

_____/

## SECOND AMENDED COMPLAINT

       Plaintiff, CRMSuite Corporation ("Plaintiff"), sues Defendants, General Motors Company,

a Delaware corporation ("GM Co."); General Motors LLC, a Delaware limited liability company

("GM LLC"); and Aquent, LLC, a Delaware limited liability company ("Aquent"); (collectively,

the "Defendants")[1] and in support thereof states as follows:

## JURISDICTION AND VENUE

       1.     Plaintiff is a Florida corporation with its principal office located in Sarasota County,

Florida.

       2.     GM Co. is a Delaware corporation doing business in Florida.

---

[1]     Plaintiff does not bring any claims against TRI Ventures, Inc., which Plaintiff originally named as Aquent, Inc., in this Second Amended Complaint based on Aquent, LLC's representations in its federal filings and in a sworn declaration of its Account Director that TRI Ventures, Inc. is a separate and distinct business entity that has no employment relationship with the individuals alleged to have acted on behalf of General Motors Company, General Motors, LLC, and Aquent, LLC during the events and transactions giving rise to this action.

3.      GM LLC is a Delaware limited liability company doing business in Florida. General Motors and GM LLC blur the lines between the two entities, if such lines exist, by consistently referring to "General Motors" as the entity.

4.      Aquent is a Massachusetts limited liability company doing business in Florida.

5.      This Court has jurisdiction over this matter pursuant to Defendants' removal of the matter to this Court from the Circuit Court of Manatee County, Florida.

6.      Venue in this Court is appropriate as the causes of action accrued in this district, including the claims subject to FLA. STAT. § 542.30.

7.      All conditions precedent to maintaining this suit have been met or otherwise waived.

8.      Plaintiff has retained the undersigned attorneys and is responsible for the reasonable fees associated with the legal services rendered in this action.

## FACTUAL BACKGROUND

9.      Plaintiff is a Sarasota based business that provides customer relationship management (CRM) software to automobile dealers.  The CRM software allows auto dealers to seamlessly and efficiently manage their customer leads and marketing needs, including leads generated through their websites.  Plaintiff has automobile dealer customers in all the major brands of manufactured vehicles.

10.     Many of Plaintiff's customers are multi-manufacturer brand dealerships.  These customers use the same CRM software to support their sales and marketing efforts at many, if not all, of their dealerships regardless of brand.  Several of Plaintiff's multiple brand customers and prospects have some General Motors stores as part of their dealership portfolio.

11.     Aquent is a staffing service that provide employees, on short term and long term projects, to various companies.  Part of Aquent's focus is staffing technology employees with major companies including Apple, Texas Instruments, Uber Eats and General Motors.

12.     Anthony Fava, an Aquent employee, is the Sales and Lead Management Program manager at General Motors.  He has a General Motors email address, anthony.fava@gm.com, and his desk is located at the General Motors offices in the Renaissance Center in Detroit, Michigan. Upon information and belief, Fava is a joint employee of Aquent and General Motors, functioning as an employee of Aquent inside General Motors while performing services as an agent of General Motors.

13.     Joint employees of Aquent and General Motors regularly identify both businesses as their employer when interacting with third parties for business purposes.

14.     For example, the lines immediately following Mr. Fava's name in e-mail correspondence first state "Aquent" in bold, orange, and capitalized letters, and then state "GM Dealer Technology Enablement" in a normal font on the next line.

15.     Aquent causes its employees who perform work for GM to clearly identify Aquent as their employer when interacting with third parties, and therefore the actions of those employees during those interactions is within the scope of their employment with Aquent.

16.     Aquent has an interest in providing leased employees to companies, particularly to assist companies in the technology development efforts.  Such companies include companies that provide CRM technologies to companies, including auto dealerships.

17.     General Motors adopted a Winning with Integrity tagline to describe its Code of Conduct in approximately 2018.  As part of that code, General Motors pledged to maintain ethical relationships with third parties, practice due diligence, and treat third parties fairly.

18.     As set forth more fully below, General Motors did not live up to its own Code of Conduct in its dealing with Plaintiff as General Motors and Aquent engaged in anti-competitive conduct, unfair competition, unfair trade practices, and tortiously interfered with Plaintiff's relationships and contracts with auto dealers.

19.     For General Motors, this conduct has been part of an unfortunate history of unsavory and illegal business practices.

20.     In early 2014, General Motors announced that it was recalling hundreds of thousands of its vehicles due to a faulty ignition switch.  The Justice Department and Congress initiated separate investigations when it became apparent that General Motors had delayed addressing the problem even though it was responsible for 13 deaths.  General Motors was even fined for failing to cooperate fully in the investigation of the defect by the National Highway Traffic Safety Administration.  The NHTSA subsequently fined General Motors $35,000,000.00 for failing to timely report the ignition switch defect.

21.     Ultimately, in September 2015, General Motors entered into a deferred prosecution agreement with the United States Justice Department and paid a $900,000,000.00 fine to resolve criminal charges concerning the ignition switch defect.

22.     Thereafter, in May 2016, General Motors announced that 135,000 SUVs were sold to consumers with window stickers that overstated the vehicles' gas mileage.

23.     In December 2016, General Motors joint venture with China's SAIC Motors was fined approximately $29,000,000.00 for monopolistic pricing behavior.

24.     Notwithstanding these past transgressions, fines and public proclamations of contrition, General Motors, now in concert with Aquent, has engaged in anticompetitive conduct

which will reduce the number of CRM vendors artificially, will result in higher prices to auto dealers, and is being accomplished by illegal, unfair, tortious conduct.

25.     General Motors artificially restricts the number of CRM vendors available to auto dealers who sell its products through a vendor certification program it currently calls the Dealer Vendor Management Program and formerly called the Dealer Technology Assistance Program (hereinafter, the "Participating CRM Vendor Program" or "Vendor Program").

26.     Unless a dealer uses a CRM product that is part of the Participating CRM Vendor Program, General Motors will not deliver customer sales leads or performance bonuses to the dealer.

27.     General Motors' technology staff provided by Aquent have duties to both General Motors and to Aquent associated with the Participating CRM Vendor Program.

28.     The technology staff's duties to General Motors and Aquent associated with the Vendor Program include communicating with CRM vendors who wish to participate in the Program.  As noted, during e-mail communications with third parties regarding the vendor program, the technology staff regularly identify first Aquent, and then General Motors as their joint employers.

29.     General Motors publishes a dealer vendor advisor website that dealers can access in order to view the CRM products listed in the Vendor Program.

30.     When a dealer integrates a CRM product into its systems, part of that process involves the dealer accessing a dealer vendor advisor website and selecting their CRM software product from the list of available products in order to receive sales leads, including sales leads generated from the dealer's own website, from General Motors when the dealer accesses the CRM platform on their computers.

31.     General Motors requires CRM vendors who wish to participate in the Vendor Program to integrate a connector server as a data communications pipeline, also simply referred to as a "pipeline," between General Motors' computers and the CRM software.

32.     General Motors further requires CRM vendors who complete the integration process to pay a regular fee to General Motors in order to list that vendor's product as approved through its Participating CRM Vendor Program.

33.     Plaintiff's own CRM software product has been available to automobile dealers who sell General Motors products through the Participating CRM Vendor Program since about 2015 with General Motors' full knowledge and permission under the labels "CRMSuite" and "Vision."

34.     Plaintiff formerly sold its software under the CRMSuite label by using a connector server pipeline provided by iMagic Lab LLC.

35.     iMagic Lab's CRM software product, Dealer CRM, was listed in the Participating CRM Vendor Program.

36.     iMagic Lab had an independent arrangement with General Motors for the payment of the regular fee for the Vendor Program during the times that Plaintiff utilized the iMagic Lab connector server pipeline.

37.     For a time, Plaintiff used the iMagic Lab connector server pipeline to sell its CRMSuite product and iMagic Lab used the pipeline to sell its Dealer CRM product.

38.     However, the iMagic Lab product ceased to exist as a standalone software product before its connector server shut down and its listing in the General Motors Vendor Program expired.

39.    In order for Plaintiff's dealer customers to use its product under the CRMSuite label, the dealers would access the General Motors dealer vendor advisor website and select the iMagic Lab product.  This process allowed leads and other data to flow from General Motors' systems, through the iMagic Lab connector server pipeline, and ultimately to CRMSuite's software product.

40.    From 2015 to 2020, Plaintiff has consistently and continuously used the connector server pipelines of other businesses, starting with iMagic Lab, to sell its software products to General Motors dealers with General Motors' full knowledge and permission.

41.    General Motors knew from 2015 to 2018 that multiple dealers of its automobile products who selected the iMagic Lab product on its dealer vendor advisor website were not using the iMagic Lab product at all, but were in fact using Plaintiff's CRMSuite product.

42.    General Motors knowingly permitted Plaintiff's CRMSuite product to be available to dealer customers through the Participating CRM Vendor Program under the iMagic Lab product name.

43.    General Motors knowingly permitted Plaintiff's dealer customers to select the iMagic Lab product on the dealer vendor advisor website in order to use the iMagic Lab connector server pipeline to receive sales leads and other data from General Motors' systems to Plaintiff's CRMSuite product platform installed on those dealers' computers.

44.    General Motors knew that the iMagic Lab product had ceased to exist as a standalone product, and nonetheless allowed the iMagic Lab product to remain on its list of approved CRM products, continued to send sales leads and other data through the iMagic Lab connector server pipeline, and allowed dealers of General Motors automobile products to select and use other software products under the iMagic Lab name on the dealer vendor advisor website.

45.     By knowingly permitting Plaintiff's CRMSuite product to be available to dealer customers through the Vendor Program under the iMagic Lab product name and through the iMagic Lab pipeline, even though the iMagic Lab product ceased to exist as a standalone product, General Motors represented to Plaintiff through its conduct that it had approved the CRMSuite product to for use by General Motors dealers and approved Plaintiff to continue to market the CRMSuite product to new dealers.

46.     Plaintiff reasonably relied on the fact that General Motors represented through its conduct that the CRMSuite product was approved under the Participating CRM Vendor Program notwithstanding the name under which that product was available to dealers through the Vendor Program (which was the iMagic Lab product at that time).

47.     Plaintiff changed its position in reliance on General Motors' conduct by selling and servicing its CRMSuite product to dealer customers who sell General Motors automobile products from 2015 to the present.

48.     The iMagic Lab software product's listing in the General Motors Participating CRM Vendor Program ended on or about March 31, 2018.

49.     Plaintiff began working with Dominion Dealer Services, LLC ("Dominion") in order to benefit General Motors dealers, and thereby also benefitting General Motors, who were using the CRMSuite product even after the iMagic Lab product was no longer listed in the Vendor Program.

50.     At the time that Plaintiff began working with Dominion, Dominion owned Autobase, another CRM software product available to dealers of General Motors automobile products through the Participating CRM Vendor Program.

51.     Dominion had an independent arrangement with General Motors for the payment of the regular fee for the Vendor Program during the times that Plaintiff utilized the Autobase connector server pipeline.

52.     A key factor in the business relationship between Plaintiff and Dominion was the fact that Dominion planned to retire the Autobase product in 2019.

53.     Plaintiff and Dominion agreed that they would market Plaintiff's software as a replacement to Autobase as Autobase approached its sunset date.

54.     During the time that Plaintiff and Dominion worked together, the two businesses had an agreement that Plaintiff could continue to sell and service the CRMSuite label of its product to dealer customers, that Dominion would resell and provide tier one service of CRMSuite's software product to dealer customers under a new "Vision" label, and that both the CRMSuite and Vision labels of Plaintiff's product would use Autobase's existing connector server with General Motors.

55.     Plaintiff and Dominion notified General Motors in early 2018 regarding their intent to use the Autobase connector server as the pipeline for both the CRMSuite and Vision labels of Plaintiff's product.  Thus, General Motors knew that customers of both Plaintiff and Dominion would use the CRMSuite product.

56.     General Motors knew and understood that Autobase would soon cease to exist as a standalone software product even though its listing in the Vendor Program had not yet expired and its connector server would not shut down for several more months.  Thus, General Motors allowed Plaintiff to sell its CRMSuite product to new dealer customers after the Autobase product was shut down.

57.     General Motors approved Plaintiff and Dominion's use of the existing Autobase connector server as the pipeline for both the CRMSuite and Vision labels of Plaintiff's product.

58.     Plaintiff then worked with its dealer customers to change their selected CRM product to Autobase on General Motors' dealer vendor advisor website, notwithstanding the fact that at all times the dealer customers were actually using Plaintiff's CRMSuite product, so that those customers could continue to receive sales leads and other data from General Motors when they used Plaintiff's CRMSuite product.

59.     General Motors in at least one case communicated directly with a dealer in March 2018 and acknowledged that General Motors would be delivering sales and service leads to the CRMSuite product platform regardless of the actual name of the product listed in its Participating CRM Vendor Program (which was Autobase at that time).

60.     General Motors knowingly made the CRMSuite and Vision labels of Plaintiff's software product available to dealers of General Motors' automobile products through the Participating CRM Vendor Program under the name Autobase.

61.     General Motors knowingly permitted Plaintiff's dealer customers to select Autobase on the dealer vendor advisor website in order to use the Autobase connector server pipeline to receive sales leads and other data from General Motors' systems to Plaintiff's CRMSuite and Vision product platform installed on those dealers' computers.

62.     General Motors knew that Autobase had ceased to exist as a standalone product, and nonetheless allowed Autobase to remain on its list of approved CRM products, continued to send sales leads and other data through the Autobase connector server pipeline, and allowed dealers of General Motors automobile products to in fact select other software products under the Autobase name on the dealer vendor advisor website.

63.     By knowingly permitting Plaintiff's software product to be available to dealer customers through the Vendor Program under the Autobase name and through the Autobase pipeline, even though Autobase ceased to exist as a standalone product, General Motors represented to Plaintiff through its conduct that it had approved the CRMSuite and Vision labels of Plaintiff's product to participate in the Vendor Program.

64.     Plaintiff reasonably relied on the fact that General Motors represented through its conduct that the CRMSuite and Vision labels of its product were approved under the Participating CRM Vendor Program notwithstanding the name under which those products were available to dealers through the Vendor Program (which was Autobase at that time).

65.     Plaintiff changed its position in reliance on General Motors' conduct by selling and servicing its CRMSuite product, including adding additional functions only required by General Motors as further described below at great expense to Plaintiff, and by allowing Dominion to resell and service its Vision product to dealer customers who sell General Motors automobile products from 2018 to the present.

66.     The Autobase product ceased to exist as a standalone product in 2019.

67.     Most of the dealers that previously used the Autobase product switched to Plaintiff's product.

68.     Plaintiff and Dominion continued to use the Autobase connector server pipeline for the CRMSuite and Vision labels, respectively, of Plaintiff's product even after Autobase itself ceased to exist.

69.     Plaintiff and Dominion originally scheduled the Autobase connector server pipeline to shut off on March 31, 2020, and for the CRMSuite and Vision labels of Plaintiff's product to thereafter utilize Plaintiff's own connector server pipeline.

70.     However, the General Motors technology staff provided by Aquent required Plaintiff's software product to include about eight additional functions in order to run it directly through Plaintiff's pipeline.

71.     The nature of the additional functions to Plaintiff's software product were such that Plaintiff could use them only for General Motors dealers because the functions would allow those dealers to obtain certain subsidies from General Motors.

72.     Since the additional functions were specific to General Motors dealers, Plaintiff would not be able to use any work it put into completing the addition of those functions to its product that would run through Plaintiff's connector server pipeline for its customers who did not sell General Motors products.

73.     Starting in 2019, Plaintiff, with Dominion's assistance, began working with the General Motors technology staff provided by Aquent to add and test with General Motors the additional functions to Plaintiff's product.

74.     The General Motors technology staff provided by Aquent, including Mr. Fava, regularly worked and communicated directly with Plaintiff from 2019 to about February 2020 regarding its efforts to add the additional functions that they required.

75.     The technology staff who worked and communicated with Plaintiff regarding the additional functions represented that they were jointly employed by General Motors and Aquent, and that their representations and actions were at all times made within the scope of their duties to both General Motors and Aquent.

76.     The General Motors technology staff provided by Aquent at all times represented to Plaintiff by their words and actions that if Plaintiff completed the addition of the required functions to its software product, then the dealer customers who used the CRMSuite and Vision

labels of its product would continue to receive sales leads, bonuses, and other benefits after the Autobase connector server shut down on March 31, 2020 as originally scheduled.

77.     The General Motors technology staff provided by Aquent at all times represented to Plaintiff by the words and actions that they had already approved its product, regardless of its label, for use by General Motors dealers because it had been available through the Vendor Program under other listed product names since 2015, and that they required only that Plaintiff complete the addition of the required functions to its product in order for dealer customers who used the CRMSuite and Vision labels of its product to continue to receive sales leads, bonuses, and other benefits after the Autobase connector server shut down.

78.     Plaintiff reasonably relied on the representations of the General Motors technology staff provided by Aquent that General Motors would continue to send sales leads, bonuses, and other benefits to dealer customers who used the CRMSuite and Vision labels of Plaintiff's software product if Plaintiff completed the addition of the functions to its product.

79.     Plaintiff changed its position in reasonable reliance on the representations of the General Motors technology staff provided by Aquent by taking steps, at an expense which exceeds $300,000.00 to date, of adding the functions required by the General Motors technology staff provided by Aquent to Plaintiff's product with Dominion's assistance.

80.     Plaintiff in fact completed the addition of several of the functions required by the General Motors technology staff provided by Aquent from 2019 to about February 2020.

81.     For example, Mr. Fava on November 12, 2019 emailed Plaintiff's employee Patrick Geddie, congratulating him and Plaintiff on completing a phase of the development and validation of the additional functions to Plaintiff's product.

82.     Plaintiff and General Motors, through Mr. Fava and Aquent, scheduled a date for the demonstrations that would mark the completion of the final steps for the additional functions to Plaintiff's product.

83.     Plaintiff understood and believed that the final demonstrations were scheduled to take place during the first full week of February, 2020.

84.     Plaintiff was ready, willing, and able to demonstrate completion and functionality of its product enhanced to General Motors and Aquent's specification and of its own connector server pipeline in February 2020.

85.     Plaintiff was further ready, willing, and able to start paying the regular fee to General Motors for participating in the Vendor Program upon completion of the testing.

86.     Prior to the first full week of February 2020, Dominion and Plaintiff negotiated and agreed, on an amicable basis, to end their relationship as Dominion's marketing efforts for the Vision label of the product were not as successful as the parties expected and Plaintiff would not need to use the AutoBase connector server pipeline upon completion of the enhancements to its product and of its own connector server pipeline in February 2020.

87.     Plaintiff and Dominion agreed as part of the termination of their business relationship that Dominion would assign its General Motors Participating CRM Vendor contract to Plaintiff and that Dominion's customers of the Vision-labeled product that Dominion resold would become Plaintiff's direct customers.

88.     Dominion notified General Motors that it and Plaintiff were ending their business relationship.

89.     Dominion further notified General Motors that it intended to assign its General Motors Participating CRM Vendor contract to Plaintiff.

90.     Dominion further notified General Motors that its customers who used the Vision-labeled product that Dominion resold would become direct customers of Plaintiff.

91.     General Motors therefore had knowledge of the advantageous contractual relationship between Dominion and Plaintiff by which Plaintiff was to receive assignment of Dominion's Participating CRM Vendor contract.

92.     General Motors also had knowledge of the specific, prospective advantageous business relationship between former customers of Dominion, as reseller of the Vision label of Plaintiff's product, and Plaintiff based on the fact that Dominion's customers were to become Plaintiff's direct customers.

93.     Dominion is a much larger company than CRMSuite and provides a broad array of services to the automotive industry other than CRM services.  Dominion did not own the Vision software, which at all times has been owned by Plaintiff.  Dominion had announced before it began assisting Plaintiff with adding the additional functions to Plaintiff's product required by General Motors and Aquent that it would shut down the Autobase pipeline.

94.     Dominion continues to maintain independent business arrangements with General Motors associated with Dominion's other services to the automotive industry.

95.     Without explanation, General Motors ceased all communications with Plaintiff regarding its product enhancements for General Motors' specified functionalities and its connector server pipeline after being informed that Dominion and Plaintiff were ending their business relations.  Plaintiff did not immediately recognize that General Motors' efforts in this regard were spearheaded by a third-party company, Aquent, that had a vested interest in providing staffing services to large companies for their technology needs, including services relating to automotive marketing and CRM.

96.     General Motors and Aquent's abrupt termination of communications with Plaintiff around the beginning of February 2020 quickly created a desperate situation for Plaintiff and General Motors dealers in light of the fact that Dominion originally planned to shut down the Autobase connector server pipeline on March 31, 2020, which would result in the termination of sales leads and other data flowing to dealer customers who used the CRMSuite or Vision labels of Plaintiff's product unless General Motors began instead sending that data to Plaintiff's own connector server pipeline.

97.     General Motors and its technology staffing provided by Aquent set out on an aggressive campaign to destroy the benefits of Plaintiff's bargain with Dominion and to interfere with Plaintiff's existing and prospective relationships with auto dealers who sold General Motors vehicles in multiple ways.

98.     Plaintiff and Dominion initially worked together to create an e-mail to the dealer customers of the Vision label of Plaintiff's product resold by Dominion.  As noted, Dominion and Plaintiff agreed that Dominion's customers who used the Vision-labeled product were to become Plaintiff's direct customers upon the termination of the two businesses' relationship.  The e-mail accordingly notified Vision customers, among other things, that "[Plaintiff] assumes full responsibility for the Vision CRM product," and that "[Dominion] will be assigning all Vision CRM contracts to [Plaintiff] effective February 1, 2020."  A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit A**.

99.     After delivery of Dominion and Plaintiff's original e-mails to the Vision customers, Dominion contacted Plaintiff to notify it that General Motors was "demanding we send an updated email to our GM active customers who received our initial e-mail notice on Monday January 27, 2019."  Dominion further stated that General Motors demanded that the updated e-mail included

the following "language provided by GM and required by them to be in the e-mail": "Furthermore, the current GM DVMP contract with Dominion Dealer Solutions will not be transferred to CRMSuite" and "After 3/31/20, Vision CRM will be removed from the GM DVMP program as a planned product and therefore Autobase will no longer be able to forward leads to Vision CRM." A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit B**.

100.    When Plaintiff inquired about the source of the changes demanded by General Motors and the impact of those changes on Plaintiff, Dominion stated that it was Aquent and General Motors' joint employee Mr. Fava making the demands, and further notified Plaintiff that Mr. Fava had cancelled the final demonstration of Plaintiff's connector server pipeline scheduled for the first full week of February:  "Tony has told me that they have cancelled our . . . testing on monday [sic] . . . .   The only thing definitive that he said was those two highlighted lines in the letter regarding the contract not being transferable, and that once Autobase is removed from the program we cannot forward leads.  *Those items needed to be included per Tony*."   A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit C** (emphasis added).

101.    Plaintiff then attempted to work with Dominion to create a letter to Vision customers that would correct the misleading impression that Plaintiff's software was not a product that General Motors had approved for use by and made available to its dealers since 2015.

102.    However, Dominion stated in e-mail correspondence to Plaintiff that General Motors had rejected Plaintiff's suggested language, and that Dominion believed it had no choice but to use language dictated by General Motors.  The subject of one set of Dominion's e-mail correspondence to Plaintiff on February 11, 2020 literally states "Dominion E-mail *requested by GM* to impacted GM Dealers."  A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit D** (emphasis added).

103.    Plaintiff stated to Dominion in a separate set of e-mail correspondence on February 11, 2020 that "we cannot approve" the e-mail message dictated to Dominion by General Motors. Dominion's response is clear: "This is the e-mail GM wants us to send." A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit E**.

104.    General Motors then caused Dominion to issue an e-mail to dealer customers of the Vision-labeled product on February 16, 2020 that is materially inaccurate. The e-mail represented that Plaintiff's software product was not a General Motors-approved product, notwithstanding its years of availability with General Motors' full knowledge and permission regardless of the product's label or the name that General Motors chose for it on the dealer vendor advisor website. The e-mail further directed customers of the Vision-labeled product to use a different product available under the Participating CRM Vendor Program that was not owned by Plaintiff. A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit F**.

105.    Based on information and belief, General Motors improperly leveraged its separate business arrangements with Dominion, that continue to exist to date, to pressure Dominion into sending the February 16, 2020 e-mail to dealer customers of the Vision-labeled product that General Motors itself dictated.

106.    Dominion was acting as General Motors and Aquent's agent when it delivered the February 16, 2020 e-mail to customers of the Vision-labeled product because General Motors and Aquent dictated material language of the e-mail and directed Dominion to send the e-mail.

107.    The February 16, 2020 e-mail that General Motors and Aquent caused Dominion to deliver to customers of the Vision-labeled product was materially inaccurate because it was contrary to General Motors' history of allowing Plaintiff's product to be available to dealers

through the Participating CRM Vendor Program regardless of whatever name General Motors chose to list on its dealer vendor advisor website as a stand-in for Plaintiff's products.

108.     The February 16, 2020 e-mail correspondence further directed dealer customers to contact General Motors for further discussion regarding General Motors' demand that the Vision customers change to a CRM vendor other than Plaintiff: "please contact us or your GM zone manager to discuss your GM lead delivery situation and the impact to you.  The Dominion team can redirect you to an appropriate contact at General Motors for support as needed."  Exhibit F.

109.     In an attempt to avoid further dispute and substantial damages, Plaintiff then sent correspondence to General Motors' General Counsel on February 20, 2020.  A true and correct copy of that correspondence is attached hereto as **Exhibit G**.

110.     General Motors did not reply until seven days later, on February 27, 2020, even as General Motors and Aquent increased their pressure on customers of the Vision-labeled product not to engage Plaintiff, on customers of the CRMSuite-labeled product to terminate their business relationships with Plaintiff, and on customers of both labels of Plaintiff's product to instead change to a different CRM vendor entirely.

111.     When General Motors finally responded, they did so in a way that smacks of deception and cover up.  Apparently not aware that 1) Autobase was no longer an existing product used by General Motors dealers, 2) Mr. Fava had written Plaintiff on November 12, 2019 on behalf of both General Motors and Aquent acknowledging that Plaintiff had completed some of the additional functions required for its product, or 3) General Motors was actually dictating Dominion's statements, General Motors' counsel claimed that nothing had occurred other than Dominion notifying General Motors that it would cease offering Autobase on March 31, 2020 and

"General Motors simply advised certain dealers of that fact and the need to obtain a replacement product."  A true and correct copy of that correspondence is attached hereto as **Exhibit H**.

112.    Between February and March 2020 General Motors and Aquent through their joint employees, including Mr. Fava, corresponded directly with dealer customers of both the Vision and CRMSuite labels of Plaintiff's product, represented to those dealers that Plaintiff's software product was not an approved product through the Participating CRM Vendor Program, and directed the dealers to use a CRM product other than CRMSuite or Vision going forward.

113.    General Motors and Aquent's representations to customers of the Vision-labeled product that Vision was not an approved product is intentional and unjustified because General Motors has knowingly permitted the Vision label of Plaintiff's software product to be available to and used by dealers from 2018 to 2020.

114.    General Motors and Aquent's representations to customers of the CRMSuite-labeled product that CRMSuite is not an approved product is intentional and unjustified because General Motors has knowingly permitted Plaintiff's product to be available to and used by dealers from 2015 to 2020.

115.    Dominion and Plaintiff separately agreed to extend the shut off date of the Autobase connector server to May 31, 2020 in order to provide Plaintiff additional time to attempt to get General Motors and Aquent to act in accordance with the fact that Plaintiff's software had been used by dealers through the Participating CRM Vendor Program with General Motors' full knowledge and permission from 2015 to 2020 notwithstanding whatever name General Motors chose to use for Plaintiff's product on its dealer vendor advisor website, and to honor their representations that they would continue to deliver sales leads, bonuses, and other benefits to

customers of the Vision- and CRMSuite-labeled products if Plaintiff added the functions required by the General Motors technology staff provided by Aquent to its product.

116.     However, the extension of the Autobase pipeline shut off date to May 31, 2020 proved unavailing because General Motors and Aquent continue to dishonor their representations to Plaintiff and to otherwise continue their course of unfair, deceptive, and tortious conduct against Plaintiff.

117.     Plaintiff stood ready, willing, and able at all times to enter direct business relationships with and service the customers of the Vision-labeled product if not for General Motors and Aquent's interference with that opportunity.

118.     The General Motors technology staff provided by Aquent, and Mr. Fava in particular, did in fact intentionally and unjustifiably prevent Dominion from assigning its Participating CRM Vendor contract to Plaintiff.

119.     General Motors and Aquent's actions with respect to the contractual relationship between Plaintiff and Dominion constitute an intentional and unjustified interference with the benefits that Plaintiff stood to gain from that relationship.

120.     General Motors and Aquent's actions with respect to the specific, identifiable former customers of the Vision-labeled product resold by Dominion also constitute an intentional and unjustified interference with the prospective advantageous business relationships that Plaintiff stood to gain.

121.     As a result of General Motors' intentional and unjustified interference with Plaintiff's prospective advantageous business relationships with former customers of Dominion and with the agreement between Plaintiff and Dominion, Plaintiff has suffered harm including the

actual loss of the prospective business opportunities with Patriot Buick GMC and other General

Motors dealers that had used Plaintiff's product for multiple years.

122.    General Motors and Aquent's actions with respect to specific, identifiable direct

customers of the CRMSuite-labeled product sold by Plaintiff constitute and intentional and

unjustified interference with those relationships that would have continued to exist if not for their

interference.

123.    As a result of General Motors' intentional and unjustified interference with

Plaintiff's advantageous business relationships with direct customers of the CRMSuite product,

Plaintiff has suffered harm including the actual loss of business relationships with Smith Chevrolet

Cadillac, Inc.; Radley Chevrolet; Cox Chevrolet & Cox Mazda; and others.

124.    General Motors' most recent actions confirm that this case is indeed merely the

latest example in its unfortunate history of unsavory and illegal business practices.

125.    General Motors filed a Declaration of Anthony Fava in federal court stating that

even if Plaintiff had added all of the functions required by General Motors and Aquent to its

product, Plaintiff would not necessarily have become a participating CRM vendor because General

Motors retains the right to contract with CRM vendors as a general matter even after they satisfy

all of General Motors' requirements for participating in the Vendor Program.

126.    General Motors further stated in a federal court filing that it has no interest in

contracting with Plaintiff specifically.

127.    General Motors and Aquent therefore engage in deceptive and unfair practices with

respect to their Participating CRM Vendor Program because they acknowledge that they could

induce a CRM vendor to undertake the significant time and expense of adding functions to a CRM

product that are unique to General Motors, and therefore cannot be used for other manufacturers of other automobile manufacturers, and nonetheless shut out that vendor from the Vendor Program.

128.   General Motors and Aquent purport to provide CRM vendors a thing of value in the form of offering a membership, credential, or certificate through the Participating CRM Vendor Program in exchange for providing a product that includes certain functions that meet their own specifications and for paying a regular fee.

129.   Plaintiff is a consumer of the Participating CRM Vendor Program because it incurred substantial time and expense to add the functions required by General Motors and Aquent to its product and its connector server pipeline, and Plaintiff stands ready, willing, and able to pay the regular fee for participation in the Vendor Program.

130.   Dealers of General Motors automobile products are also consumers of General Motors and Aquent's Participating CRM Vendor Program because General Motors requires them to use CRM products approved through its Vendor Program in order to receive sales leads, bonuses, and other benefits from General Motors.

131.   General Motors and Aquent engage in unfair and deceptive actions in the conduct of their Participating CRM Vendor Program because the listed CRM products do not accurately reflect the products actually being used by dealers and because they reserve the right to decline to add a CRM vendor's product to the Vendor Program even if they have induced that CRM vendor to incur substantial time and expense to add certain functions to its software product pursuant to General Motors and Aquent's specifications.

132.   General Motors and Aquent have, in fact, engaged in unfair and deceptive conduct against Plaintiff in this matter because they knowingly permitted Plaintiff's software products to be available to dealers through the Vendor Program under other names for several years;

represented that they would continue to deliver sales leads, bonuses, and other benefits to dealer customers of the Vision and CRMSuite labels of Plaintiff's product if Plaintiff added certain functions to its product; induced Plaintiff to complete the addition of several of those required functions to its product; terminated all communication with Plaintiff without warning; stated to specific prospective and current customers of Plaintiff that they will no longer receive sales leads and other benefits if they continue to use the Vision or CRMSuite labels of Plaintiff's products; and have now taken the position that they will no longer allow Plaintiff's products to be available to dealers of General Motors products through the Vendor Program under any circumstances.

133.    Plaintiff has been aggrieved and has suffered damages as a result of General Motors and Aquent's unfair and deceptive conduct with respect to the Participating CRM Vendor Program.

134.    Dealers have also been aggrieved and have suffered damages as a result of General Motors and Aquent's unfair and deceptive conduct with respect to the Participating CRM Vendor Program because they must now pay a higher price for a similar kind of CRM product and service that Plaintiff provides.

135.    Plaintiff's change in position by entering business relationships with dealers of General Motors customers from 2015 to the present has ultimately been to its detriment now that General Motors and Aquent have falsely represented to Plaintiff's customers that neither the CRMSuite nor the Vision labels of products are actually approved through the Participating CRM Vendor Program, and that the customers of Plaintiff's products will no longer receive sales leads and other benefits from General Motors if they continue to use Plaintiff's products.

136.    Plaintiff's change in position by incurring substantial time and expense to add the additional functions required by General Motors and Aquent to its product has also been to its

detriment because General Motors and Aquent have stated that they will no longer allow Plaintiff's products to be available to dealers of General Motors products through the Participating CRM Vendor Program.

137.    General Motors and its technology staff provided by Aquent have additionally told General Motors dealers that they may not even use Plaintiff's products in addition to other CRM products which are listed as approved through the Participating CRM Vendor Program

138.    Plaintiff accordingly seeks declaratory relief, injunctive relief, and damages against General Motors and Aquent.

## COUNT I
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT AGAINST ALL DEFENDANTS

139.    CRMSuite incorporates paragraphs 1 through 138 as though fully set forth herein.

140.    This is an action by Plaintiff for violation of the Florida Deceptive and Unfair Trade Practices Act against all Defendants.

141.    Florida law prohibits unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce.

142.    Defendants, by their actions set forth above, have engaged in unconscionable acts and practices in the conduct of trade and commerce by, inter alia:

    a.  Inducing Plaintiff to incur substantial time and expense to add multiple functions to its software product notwithstanding the fact that Defendants now claim that they never intended to allow General Motors auto dealers to continue to receive sales leads, bonuses, and other benefits if they used Plaintiff's CRM product regardless of whether Plaintiff completed the addition of those functions or not.

b.  Falsely representing to General Motors auto dealers that Plaintiff's products are not approved through its Participating CRM Vendor Program notwithstanding the fact that Defendants allowed dealers to select and use Plaintiff's products through the dealer vendor advisor website under different names for several years.

c.  Threatening to withhold earned performance bonuses from General Motors auto dealers unless they terminate their contracts with Plaintiff or decline to contract with Plaintiff.

d.  Threatening to withhold leads generated through the General Motors auto dealers web sites—which are captured by Defendants—unless they terminate their contracts with Plaintiff or decline to contract with Plaintiff.

e.  Refusing to communicate with Plaintiff from February 2020 forward after Defendants' personnel had communicated directly with Plaintiffs' employees for months while Plaintiff added the additional functions required by Defendants—at hundreds of thousands of dollars expense to Plaintiff—as Defendants made the calculated decision to refuse to allow Plaintiff to complete the last testing scheduled for the first week of February as they set out to destroy Plaintiff's relationships and contracts with General Motors auto dealers.

f.  Interfering with Plaintiff's contracts and its specific, prospective business relationships with General Motors auto dealers with the result that the dealers are required to do business with Plaintiff's competitors who in many instances charge dealers two to three times as much for the services provided by Plaintiff.

g.  Providing Plaintiff's customer information to Plaintiff's competitors to assist said competitors in soliciting CRM contracts with said customers.

143.    As a result of Defendants' unfair, deceptive and unconscionable actions, Plaintiff has been injured.

144.    As a result of Defendants' unfair, deceptive and unconscionable actions, the General Motors auto dealers have also been injured.

WHEREFORE, Plaintiff requests a declaration that Defendants' above-described actions violate Florida's Deceptive and Unfair Trade Practices Act, that Defendants be enjoined from continuing this conduct, that Plaintiff be awarded damages, punitive damages, the costs of this action, attorneys' fees, and that Plaintiff be awarded such other and further relief as this Court deems just and proper.

## COUNT II
## TORTIOUS INTERFERENCE AGAINST ALL DEFENDANTS

145.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 as though fully set forth herein.

146.    This is an action by Plaintiff against all Defendants for tortious interference.

147.    Plaintiff is engaged in advantageous business relationships and prospective relationships with auto dealers under which it has legal rights.

148.    Defendants knew of these advantageous business relationships and prospective business relationships and engaged in acts to intentionally and unjustifiably interfere with the same.

149.    Plaintiff has been damaged as a result of the aforementioned acts of Defendants.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, punitive damages, interest, and the costs of this action and any and all such further relief as this court may deem just and proper.

**COUNT III**
**TORTIOUS INTERFERENCE AGAINST ALL DEFENDANTS**

150.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 as though fully set forth herein.

151.    This is an action by Plaintiff against Defendants for tortious interference.

152.    Plaintiff is engaged in an advantageous contractual relationship with Dominion under which it has legal rights.

153.    Defendants knew of this advantageous contractual relationship and engaged in acts to intentionally and unjustifiably interfere with the same.

154.    Plaintiff has been damaged as a result of the aforementioned acts of Defendants.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, punitive damages, interest, and the costs of this action and any and all such further relief as this court may deem just and proper.

**COUNT IV**
**EQUITABLE ESTOPPEL AGAINST THE GENERAL MOTORS DEFENDANTS**

155.    Plaintiff hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 as though fully set forth herein.

156.    This is an action by Plaintiff against GM. Co. and GM LLC (collectively, "General Motors") for equitable estoppel.

157.    General Motors represented to Plaintiff by its conduct that it had approved the CRMSuite and Vision labels of its product to participate in the Participating CRM Vendor Program notwithstanding the particular name that General Motors chose to list as a stand-in for the CRMSuite or Vision labels on its dealer vendor advisor website.

158.    Plaintiff reasonably relied on the fact that General Motors represented through its conduct that the CRMSuite and Vision labels of its product was approved under the Participating CRM Vendor Program.

159.    Plaintiff reasonably changed its position in reliance on General Motors' conduct by selling and servicing the CRMSuite label, by allowing Dominion to resell and service its Vision label of its product to dealer customers who sell General Motors automobile products, and by spending months and hundreds of thousands of dollars adding additional functionality to its product at General Motors and Aquent's direction..

160.    Plaintiff's change in position has been to its detriment as General Motors has recently taken the position that Plaintiff's software product is not actually approved through the Participating CRM Vendor Program and that any dealers who continue to use or begin to use Plaintiff's software product will not receive sales leads, bonuses, and/or other benefits from General Motors, and therefore Plaintiff has lost existing and prospective business relationships with dealers of General Motors automobile products.

161.    Plaintiff has been damaged as a result of its detrimental change in position.

162.    General Motors is estopped from claiming that Plaintiffs' software product is not an approved product through its Participating CRM Vendor Program.

WHEREFORE, Plaintiff demands judgment for damages, for lost profits, for consequential damages, and for such other and further relief as the Court deems just and proper.

## COUNT V
## PROMISSORY ESTOPPEL AGAINST ALL DEFENDANTS

163.    Plaintiff hereby realleges and reincorporates by reference the allegations contained in paragraphs 1 through 138 as if fully set forth herein.

164.    This is an action by Plaintiff against all Defendants for promissory estoppel.

165.    General Motors and Aquent represented to Plaintiff that they would continue delivering sales leads, bonuses, and other benefits to dealer customers of the CRMSuite or Vision labels of Plaintiff's software product if Plaintiff added certain functions to its product which would be delivered through Plaintiff's connector server pipeline.

166.    Plaintiff reasonably relied on General Motors and Aquent's representations.

167.    Plaintiff changed its position in reasonable reliance on General Motors and Aquent's representations by undertaking considerable time and expense to complete the addition of multiple functions to its product totaling over $300,000.00 in expenses to date.

168.    Plaintiff's change in position has been to its detriment because General Motors and Aquent have recently taken the position and advised dealers that Plaintiff's software product is not actually approved through the Participating CRM Vendor Program, that they will not grant new approval to Plaintiff's software product even if Plaintiff completes the addition of the functions they required, and that any dealers who continue to use or begin to use Plaintiff's software product will not receive sales leads, bonuses, and/or other benefits from General Motors, therefore Plaintiff has incurred wasted time and expense in reliance on their earlier representations, and Plaintiff has additionally lost existing and prospective business relationships with dealers of General Motors automobile products.

169.    Plaintiff has been damaged as a result of its detrimental change in position.

WHEREFORE, Plaintiff demands judgment for damages, for lost profits, for consequential damages, and for such other and further relief as the Court deems just and proper

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues herein triable by jury.

Respectfully submitted,

/s/ James Jeffrey Burns

JOHN E. JOHNSON
Florida Bar No. 593000
jjohnson@jclaw.com
JAMES JEFFREY BURNS
Florida Bar No. 111395
jburns@jclaw.com
**JOHNSON, CASSIDY, NEWLON &**
**DECORT, P.A.**
2802 N. Howard Avenue
Tampa, Florida 33607
Telephone: (813) 699-4859
Facsimile:  (813) 235-0462
*Attorneys for Plaintiff, CRMSuite*
*Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 16, 2020, a true and correct copy of the foregoing was

electronically filed with the United States District Court, Middle District of Florida, by using the

CM/ECF System, which will serve a copy on all counsel of record.

/s/ James Jeffrey Burns
*Attorney*