# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CRMSUITE CORPORATION,

     Plaintiff,

v.                          Case No. 8: 20-cv-762-T-02-WFJ-AAS

GENERAL MOTORS COMPANY;
GENERAL MOTORS, LLC;
AQUENT, LLC; and AQUENT, INC.

     Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND DENYING DEFENDANT GM'S MOTION TO STRIKE

This cause comes before the Court on Defendant General Motors Company, General Motors, LLC's (collectively, "GM"), Aquent, LLC, and Aquent, Inc.'s (collectively, "Aquent") Motions to Dismiss, Dkts. 41, 42, Plaintiff's Amended Complaint, Dkt. 38, and Defendant GM's Motion to Strike certain allegations in the Amended Complaint, Dkt. 43. Plaintiff has responded to all Defendants' motions. Dkts. 46, 47. With the benefit of full briefing, the Court grants the Motions to Dismiss without prejudice, and denies GM's Motion to Strike. [1]

---

[1] In the alternative, Aquent moves for Plaintiff to provide a more definite statement. Dkt. 41 at 23–24. Because the Court grants Defendants' Motions to Dismiss without prejudice, the motion for more definite statement is moot.

# I. BACKGROUND

## A. Nature of the Dispute

This case arises from a failed business relationship. Plaintiff brings this lawsuit based on alleged actionable conduct Defendants engaged in while administering GM's Vendor Management Program. The Amended Complaint asserts five counts: (I) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA" or "the Act"); (II) tortious interference with a business relationship; (III) tortious interference with a contractual relationship; (IV) equitable estoppel; and (V) promissory estoppel. Plaintiff seeks declaratory and injunctive relief, damages, costs, and attorney's fees. Dkt. 38 ¶¶ 138, 144.

## B. Factual Allegations

At this stage, the Court recites and considers the facts as alleged by Plaintiff. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). Plaintiff CRMSuite is a Sarasota-based corporation that provides customer relationship management (CRM) software to auto dealerships across Florida. Dkt. 38 ¶ 9. Plaintiff produces an eponymous CRM software product that allows its dealer clients to manage customer sales leads, including those generated through the dealers' websites. *Id.* Plaintiff's customers are mainly mutli-brand dealerships, and many sell GM-manufactured vehicles. *Id.* ¶¶ 9–10.

2

GM requires all dealerships that sell its vehicles to purchase CRM products from GM-approved vendors. Dkt. 38 ¶ 26. To become an approved vendor, a software provider must meet the requirements GM imposes under its dealer vendor management program. *Id.* One of the most important requirements is that vendors must integrate a connector server between GM's computer network and the CRM software product, called a pipeline. *Id.* ¶¶ 30–31. Once a vendor establishes a pipeline and meets the other program requirements, the vendor may list its CRM products on GM's dealer vendor advisor website where dealers browse and shop from the various GM-approved CRM products. *Id.* ¶ 29. Approved vendors must also pay a regular fee to GM to list their products on the site. *Id.* ¶ 32.

Defendant Aquent is a technology staffing agency. Aquent provides technology staff to GM to operate and manage the CRM sales lead program, including the vendor approval program. *Id.* ¶¶ 12, 27. Once assigned to GM, Aquent employees work from GM's corporate offices and use GM email accounts. *Id.* ¶ 12.

Plaintiff began marketing its CRMSuite software on the vendor advisor site in 2015. *Id.* ¶ 33, 41. But it did so not as a GM-approved vendor. It had not developed an integrated pipeline. So Plaintiff instead marketed its software on GM's site by using a third-party software producer's pipeline. *Id.* ¶¶ 39–40.

Plaintiff kept marketing its software through a third-party pipeline through 2020 and claims GM was fully aware of this and did not object. Dkt. 38 ¶ 40.

In 2018, Plaintiff began marketing CRMSuite through Dominion Dealer Services, LLC. *Id.* ¶ 50. Plaintiff and Dominion marketed their respective products through Dominion's pipeline: Plaintiff marketed CRMSuite and Dominion marketed its product, Autobase. Dkt. *Id.* ¶¶ 50–51.

Dominion decided it would retire its Autobase product in 2019 and began marketing CRMSuite under its own label, "Vision." *Id.* ¶¶ 52–54. When Vision underperformed sales expectations, Dominion decided to retire its pipeline, pegging March 31, 2020, as the sunset date. *Id.* ¶ 69. In the interim, Dominion agreed to let Plaintiff keep marketing CRMSuite through the Dominion pipeline.

Preparing for life after Dominion, Plaintiff began developing its own pipeline to market its software directly to its dealer customers as a GM-approved vendor. *Id.* ¶¶ 69–73. Plaintiff contacted members of GM's technology staff provided by Defendant Aquent. *Id.* ¶ 73. Members of the technology staff informed Plaintiff that it would need to add about eight new functions to the CRMSuite software before it could integrate its pipeline with GM's computer systems. *Id.* ¶ 70.

Plaintiff began working on the required upgrades to its software and pipeline, investing $300,000 into the project. *Id.* ¶ 79. From 2019 to February

4

2020, Plaintiff completed several of the additional functions, which GM's staff validated and approved. Dkt. 38 ¶¶ 80–81, 111. The tests for the remaining functions were slated for the first full week of February 2020. *Id.* ¶ 83. After these were completed, Plaintiff believed it would be a GM-approved vendor, and it was prepared to begin paying the vendor program fee. *Id.* ¶ 85.

Just before final testing, Dominion and Plaintiff officially agreed to end their business relationship. They agreed that Plaintiff would no longer use the Autobase pipeline once its own pipeline was completed in February 2020. *Id.* ¶¶ 86–87. Dominion also agreed to assign its rights under its GM vendor contract to Plaintiff and transfer to Plaintiff its remaining customers that were still using the Vision label of CRMSuite. *Id.* ¶ 87. Dominion sent an email to its customers explaining that Plaintiff would take responsibility for servicing the Vision product and would assume all of Dominion's outstanding CRM contracts. *Id.* ¶ 98; Dkt. 38-1.

Dominion informed GM of the plan to transfer to Plaintiff its rights under the vendor contract. GM sales lead program manager Anthony Fava (also an employee of Aquent) responded informing Dominion that its rights under the contract were not assignable. He further directed Dominion to notify its customers that they would not be transferred to Plaintiff and the Vision CRM product would no longer forward sales leads after March 31, 2020. Mr. Fava also informed

Dominion that Plaintiff's upcoming functions test was cancelled. *Id.* ¶ 100; Dkt. 38-3.

Dominion, having other business with GM outside the CRM sphere, heeded GM's request. It emailed its dealer customers, notifying them that once Vision went offline their accounts would not be transferred to Plaintiff and they would need to begin using a new GM-approved CRM product, which did not include CRMSuite. Dkt. 38 ¶ 104; Dkt. 38-6.

After sending the email, Dominion agreed to delay the shutdown date for Autobase to May 31, 2020, hoping Plaintiff and GM could settle their differences. Dkt. 38 ¶ 115. They could not. GM declined to allow Plaintiff to market CRMSuite on its vendor advisor website. *Id.* ¶ 116.

### C. Procedural History

Plaintiff sued Defendants in state court. Dkt. 1-1. Defendants removed to this Court. Dkt. 1; Dkt. 1-9. Plaintiff then withdrew its Complaint and filed the Amended Complaint now before the Court. Dkts. 32, 38. Plaintiff's specific claims are based on two theories of harm: (1) detrimental reliance—Defendants represented, through "words and actions," that Plaintiff's product was GM-approved and would remain as such upon completion of the required upgrades; and (2) tortious interference in Plaintiff's business relationships with its dealer customers and its contractual relationship with Dominion. Dkt. 38 ¶¶ 70–79, 105,

118–23. Both these theories also form the basis for the FDUTPA claim. *Id.* ¶¶ 139–44. Defendants move to dismiss all counts for failure to state a claim. Dkts. 41, 42.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts sufficient to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering the motion, the Court accepts all factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted).

## III. DISCUSSION

### A. Aquent's Vicarious Liability

Plaintiff seeks to hold Aquent liable for the actions of its employees that it placed within GM to work as members of GM's technology staff. Defendant Aquent seeks to dismiss all Counts against it, arguing that Plaintiff has failed to establish a proper basis for vicarious liability by asserting what amounts to a right to relief based on strict liability. Dkt. 41 at 4–9. The Court agrees with Aquent.

7

Under Florida law, the doctrine of *respondeat superior* holds an employer responsible for harm caused by its employees acting within the scope of their employment. *City of Boynton Beach v. Weiss*, 120 So. 3d 606, 611 (Fla. 4th DCA 2013). An employee's conduct falls within the scope of employment when it "(1) is of the kind the employee is hired to perform, (2) occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) is activated at least in part by a purpose to serve the master." *Goss v. Human Servs. Assocs., Inc.*, 79 So. 3d 127, 132 (Fla. 5th DCA 2012). Moreover, "[a]bsent control, there is no vicarious liability for the act of another, even for an employee." *Vasquez v. United Enters. of Sw. Fla., Inc.*, 811 So. 2d 759, 761 (Fla. 3d DCA 2002) (per curiam).

Here, Plaintiff has not plausibly alleged the prerequisites to establish *respondeat superior* liability. First, the Amended Complaint does not allege that Aquent controlled, directed, or even influenced the day-to-day activities of its employees once they were assigned to GM's technology staff. It states they worked in GM facilities, maintained GM email addresses, and managed GM's vendor program while applying GM's standards. More specifically, the Amended Complaint does not state that Aquent influenced any decision-making related to GM's vendor program—the basis for Plaintiff's claims. Second, and perhaps most important, once assigned to GM, Aquent's employees worked only to advance

8

GM's interests. All the actions of the technology staff that caused Plaintiff's alleged harm were taken in furtherance of GM's vendor program—intended to enforce the program's standards and to further GM's interests and the interests of GM dealerships.

Plaintiff's primary argument in response is that the technology staff continued to hold themselves out as Aquent employees, mainly by including Aquent's trade name in the signature block of their corporate emails. Dkt. 47 at 6. This misses the point. This does not show that Aquent exercised control over the technology staff in their decisions related to the GM vendor program. More specifically, this does not show that the technology staff were working to further Aquent's interests when they took the actions that allegedly harmed the Plaintiff here. In essence, Plaintiff is seeking to impose strict liability on Aquent, based solely on the existence of an employment relationship—something Florida law does not allow. *See Vasquez*, 811 So. 2d at 761 ("Florida courts do not use the label 'employer' to impose strict liability under a theory of *respondeat superior* but instead look to the employer's control or right of control over the employee at the time of the negligent act.").

Accordingly, all counts against Aquent are dismissed without prejudice. Should Plaintiff decide to replead, it must state a plausible basis for *respondeat superior* liability—by showing more than the mere existence of an employment

relationship between Aquent and the employees it placed within GM's technology staff. The rest of the Court's analysis will focus on GM's arguments to dismiss each specific count.

### B. Count I: FDUTPA Violation

FDUTPA proscribes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204 (2019). The statute's stated purpose, among other things, is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). FDUTPA's provisions are to be "construed liberally" to achieve this end. *Id.* § 501.202. And the Act allows for injunctive relief, award of actual damages, recovery of costs, and attorney's fees. *See* Fla. Stat. § 501.211.

To state a claim for damages, a plaintiff must allege "(1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." [2] *State v. Beach Blvd Auto.*

---

[2] Count I also seeks punitive damages and injunctive relief. As Defendants rightly point out, punitive damages are outside the scope of FDUTPA. *See Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984). As for injunctive relief, the Amended Complaint makes clear the conduct that allegedly violated FDUTPA was specifically directed at the Plaintiff and is not ongoing. With no allegations or even suggestion that Plaintiff stands to suffer future harm based on Defendants' conduct, injunctive relief is not warranted. *See, e.g.*, *Snyder v. Green Rds. of Fla. LLC*, 430 F. Supp. 3d 1297, 1304 (S.D. Fla. 2020) (dismissing claim for injunctive relief under FDUTPA where plaintiff failed to allege likelihood of future injury as required to satisfy Article III standing).

*Inc.*, 139 So. 3d 380, 393 (Fla. 1st DCA 2014). Plaintiff claims it was injured when GM unfairly denied it entry to the vendor program and intentionally harmed its business relationships with its dealer customers.[3] Defendant GM moves to dismiss Plaintiff's FDUTPA claim for failure to sufficiently allege actual damages, a consumer injury, or that Plaintiff was harmed in a consumer transaction, as required to confer statutory standing. The Court will begin with standing.

### 1. Statutory Standing

FDUTPA contains what is considered a standing provision. Section 501.211 of the Florida Statutes provides that "any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs." Fla. Stat. § 501.211(2). Federal district courts in Florida interpreting this provision adopt one of two competing views: the narrow view or the permissive view. *Dem. Rep. Congo v. Air Cap. Grp., LLC*, 614 F. App'x 460, 468 (11th Cir. 2015) (acknowledging the interpretive split).

Defendant GM advocates the narrow view. Courts adhering to this view interpret the above provision as permitting only those persons deceived when buying goods and services to sue for damages. *See, e.g.*, *Pinecrest Consortium,*

---

[3] Unlike Aquent, GM does not seek to avoid vicarious liability for the actions of the technology staff.

*Inc. v. Mercedes-Benz USA, LLC*, No. 13-20803-CIV, 2013 WL 1786356, at *1
(S.D. Fla. Apr. 25, 2013) (holding that FDUTPA "has no application to entities
complaining of tortious conduct which is not the result of a *consumer transaction*"
(quotations omitted)); *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339,
1350 (S.D. Fla. 2009) (holding that non-consumers are not entitled to monetary
damages under FDUTPA). Thus, an action for damages requires the injury to have
occurred as a result of a consumer transaction. *Monsanto Co. v. Campuzano*, 206
F. Supp. 2d 1252, 1268 (S.D. Fla. 2002) (holding that FDUTPA claims "cannot be
maintained unless the alleged unfair or deceptive acts or practices complained of
involved a consumer transaction").

GM maintains that any injury Plaintiff allegedly suffered resulted from a
commercial arrangement, not a consumer transaction. Therefore, Plaintiff cannot
seek relief under FDUTPA.

The permissive view, on the other hand, shuns the consumer transaction
requirement. *See, e.g.*, *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp.
2d 1134, 1145–46 (M.D. Fla. 2007); *James D.Hinson Elec. Contracting Co., Inc.
v. Bellsouth Telecomms., Inc.*, No. 3:07–cv–598–J–32MCR, 2008 WL 360803, at
*2–3 (M.D. Fla. Feb. 8, 2008). Courts applying this view read section 501.211 to
allow any person, including businesses, injured by an unfair or deceptive practice
to sue for actual damages, no matter if the harm occurred during a consumer sale.

12

The reading is based on FDUTPA's broad and inclusive language and the 2001 amendment to section 501.211 that replaced "consumer" with "person." *See, e.g.*, *Niles Audio Corp. v. OEM Sys. Co.*, 174 F. Supp. 2d 1315, 1319–20 (S.D. Fla. 2001) (concluding that legislature's amendment to Fla Stat. §501.211(2) replacing "consumer" with "person" was intended to expand the provision's damages remedy to all those harmed by a violation of the statute and thus allowing non-consumer to bring damages claim).

The Court finds the permissive view to be the correct one. First, the text of the statute supports it. The replacement of "consumer" with "person" in section 501.211(2) is significant and signals the legislature's desire to expand the damages remedy. *See Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015). As already noted, the Act proscribes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204. "Trade or commerce" refers to "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." *Id.* § 501.203(8). "'Thing of value' may include, without limitation, any moneys, donation, membership, credential, certificate, prize, award, benefit, license, interest, professional

13

opportunity, or chance of winning." *Id.* § 501.203(9). These provisions must then

be "construed liberally" to further the policy goal of "protect[ing] the consuming

public and legitimate business enterprises from those who engage in unfair

methods of competition, or unconscionable, deceptive, or unfair acts or practices."

*Id.* § 501.202.

 Notably absent from the statutory text is any mention of consumer

transaction. *See Cont'l 332 Fund, LLC v. Albertelli*, No. 2:17-cv-41-FTM-

38MRM, 2019 WL 2009369, at *2 (M.D. Fla. May 7, 2019). In fact, the Act once

contained this term and a definition for it. But the legislature struck both from the

Act in 1993, while also expanding the definition of "consumer" to include several

business entities and the catch-all "any commercial entity." *Beacon Prop. Mgmt.,*

*Inc. v. PNR, Inc.*, 890 So. 2d 274, 277 (Fla. 4th DCA 2004) (citing Ch. 93–38, § 2,

Laws of Fla.). These alterations further suggest a broad reading of the standing

provision.

 If the statutory text were not enough, Florida's intermediate courts have also

rejected the consumer transaction requirement. They have allowed businesses to

sue other business entities for unfair and deceptive acts committed in a

commercial, non-consumer context. *See Bailey v. St. Louis*, 196 So. 3d 375, 383

(Fla. 2d DCA 2016) (finding that "section 501.211(2) evinces a legislative

directive that the remedy of damages is not limited to a consumer" and remanding

14

for trial court to award damages to competing business for FDUTPA violation);

*Caribbean Cruise Line*, 169 So. 3d at 169 (finding competing business was entitled

to sue for damages under FDUTPA). "Absent a clear decision from the Florida

Supreme Court on this issue, '[the Court is] bound to follow decisions of the state's

intermediate appellate courts unless there is some persuasive indication that the

highest court of the state would decide the issue differently.'" *Nunez v. Geico Gen.*

*Ins. Co.*, 685 F.3d 1205, 1210 (11th Cir. 2012) (quoting *McMahan v. Toto*, 311

F.3d 1077, 1080 (11th Cir. 2002)), *certified question answered*, 117 So. 3d 388

(Fla. 2013). The Court finds no such indication, given the statutory text.

Thus, section 501.211(2) should be read as permitting all persons, non-

consumers included, harmed by an unfair or deceptive practice in any trade or

commercial activity to sue for damages. Here, Plaintiff, claiming injury due to

GM's alleged unfair or deceptive representations in the management of its vendor

program, would fit within these criteria. GM was offering a thing of value

(certified-vendor status) for which vendors paid a regular fee.

### 2. *Consumer Injury*

While a consumer transaction is not required to bring a claim, demonstrating

a consumer injury is required. When alleging an unfair or deceptive act, plaintiffs

must show that the unfair or deceptive practice caused an injury to consumers.

*Caribbean Cruise Line*, 169 So. 3d at 169 (clarifying that claimant, even non-

consumer, must "prove that *there was an injury or detriment to consumers* in order to satisfy all of the elements of a FDUTPA claim"); *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 212 (Fla. 4th DCA 2019) (same).

GM argues that Plaintiff has failed to plead a valid consumer injury.[4] The Amended Complaint states that Plaintiff was a consumer of the GM CRM vendor program because it was prepared to become a certified vendor and begin paying the vendor fee before GM unfairly excluded it from the program. Dkt. 38 ¶ 128–29. Plaintiff also states that the participating dealerships were consumers because they are the end purchasers of CRM products through the vendor program. *Id.* ¶ 130. According to GM, Plaintiff and the dealerships were consumers in the general sense of the word, not under the statute. Both were sophisticated businesses, and their participation in the vendor program was a commercial transaction, not a traditional consumer transaction for the purchase of goods and services. Dkt. 42 at 9. In making this argument, GM does not point to any specific authority, statutory or otherwise, to support its position. *Id.* at 9.

Turning once again to the text of the statute, the Act does not define "consumer injury," but does define a "consumer" as "an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture;

---

[4] GM does not argue that Plaintiff has failed to allege an unfair or deceptive act, so the Court will not address this issue.

partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination." Fla. Stat. § 501.203(7). Applying this definition, it follows that virtually any injury resulting from an unfair or deceptive practice occurring in trade or commerce is a "consumer injury." And the Amended Complaint states a consumer injury—to Plaintiff by its incurring expenses induced by GM's representations and actions, Dkt. 38 ¶ 79, 142, and to the dealers in that they were forced to purchase other CRM products from other GM-approved vendors at two-to-three times the cost after Plaintiff was barred from the vendor site. Dkt. 38 ¶ 142–43.

Even applying GM's more narrow construction, the dealerships at least would be considered consumers. They were buying goods—CRM products—through the GM vendor program and harmed by paying a significantly higher price for a product comparable to Plaintiff's. GM's concern that this is a vicarious injury is of no moment. Florida courts require an injury to *a* consumer, not that the *plaintiff* suffer a consumer injury. *See Caribbean Cruise Line*, 169 So. 3d at 169.

### 3. Causation and Actual Damages

Defendant GM asserts that Plaintiff has not sufficiently pled actual damages. GM notes that Count I states a conclusory allegation that "[a]s a result of Defendants' unfair, deceptive and unconscionable actions, Plaintiff has been injured." Dkt. 38 ¶ 143. This is where Plaintiff's claim ultimately fails.

17

While Count I incorporates all the preceding factual allegations levied in the Amended Complaint, the previous allegations detail Plaintiff's lost business relationships with its dealer customers, loss of prospective customers transferred from Dominion, and expenses incurred in upgrading its software. *Id.* ¶ 97–98, 110, 119–23, 142–43. But the Amended Complaint does not make clear which damages are specifically attributable to the alleged violation of FDUTPA versus the other causes of action. This requires the Court to "speculate as to which factual allegations pertain to [this] count." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1359 n.9 (11th Cir. 1997).

Because the Amended Complaint does not specify the actual damages Plaintiff suffered, Count I is dismissed without prejudice for Plaintiff to replead its claim. That said, Plaintiff is advised not to plead consequential damages, such as future lost profits stemming from the termination of its sales relationships, because these are not actual damages awardable under the Act. *See Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1294 (M.D. Fla. 2009) ("[U]nder FDUTPA, 'actual damages' do not include consequential damages, precluding recovery of future lost profits.").

### C. Counts II and III: Tortious Interference

Count II alleges Defendants tortiously interfered in Plaintiff's business relationships with its GM dealer customers. Count III alleges Defendants interfered with Plaintiff's contractual relationship with Dominion. Both claims fail.

A claim for tortious interference with a contractual or business relationship requires: "(1) the existence of a business relationship or contract; (2) knowledge of the business relationship or contract on the part of the defendant; (3) an intentional and unjustified interference with the business relationship or procurement of the contract's breach; and (4) damage to the plaintiff as a result of the interference." *Howard v. Murray*, 184 So. 3d 1155, 1166 (Fla. 1st DCA 2015) (citing *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)).

In addition, "the interfering defendant must be a third party, a stranger to the . . . relationship." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999). "Under Florida law, a defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009).

19

As Defendant GM rightly points out, it is not a stranger to Plaintiff's relationships with either the auto dealerships or Dominion. As for the dealerships, GM created these relationships and set the parameters for them. Plaintiff marketed its product to the dealers through the vendor site GM created and operated. GM also set the requirements vendors, like Plaintiff, must fulfill to sell products to its affiliated dealers on the site. Count II is therefore dismissed.

As for the contractual relationship with Dominion, GM had a financial stake in this relationship. At the core of the agreement between Dominion and the Plaintiff was the proposed transfer of Dominion's rights under its vendor contract with GM to Plaintiff, which GM rejected. GM certainly had a financial interest in the transfer of rights under a contract to which it was a party. Moreover, it is not clear that the vendor contract even allowed Dominion to assign its rights. So in addition to not being a stranger to the Plaintiff-Dominion relationship, GM was also exercising its own legal rights under the vendor agreement by rejecting the proposed assignment. As a result, Count III is also dismissed.

### D. Count IV: Equitable Estoppel

GM moves to dismiss Count IV of the Amended Complaint. GM maintains that under Florida law equitable estoppel is not a standalone cause of action, but an affirmative defense. This is correct. *See State, Agency for Health Care Admin. v. MIED, Inc.*, 869 So. 2d 13, 20 (Fla. 1st DCA 2004); *Dep't of Transp. v. FirstMerit*

*Bank*, 711 So. 2d 1217, 1218 (Fla. 2d DCA 1998). Plaintiff concedes this point in its response. Dkt. 47 at 17 n.2. Count IV is therefore dismissed with prejudice.

### E.  Count V: Promissory Estoppel

Count V asserts a claim for promissory estoppel. GM argues count V should be dismissed because Plaintiff has not alleged an affirmative and sufficiently definite promise. Dkt. 42 at 16–23. The Court agrees.

To state a claim for promissory estoppel under Florida law, a plaintiff must allege: (1) a promise made by the defendant; (2) "which the [defendant] should reasonably expect to induce action or forbearance on the part of the [plaintiff]"; (3) that in fact induced such action or forbearance; and that (4) "injustice can be avoided only by enforcement of the promise." *W.R. Grace & Co. v. Geodata Servs. Inc.*, 547 So. 2d 919, 924 (Fla. 1989) (quoting Restatement (Second) of Contracts § 90 (Am. Law Inst. 1979)). The promise relied on must be an affirmative promise, *U.S. Sec. Ins. Co. v. Shivbaran*, 827 So. 2d 1090, 1092 (Fla. 3d DCA 2002), and must be "sufficiently definite in time or term or reasonableness." *W.R. Grace & Co.*, 547 So. 2d at 925; *Vencor Hosps. v. Blue Cross Blue Shield of R.I.*, 284 F.3d 1174, 1185 (11th Cir. 2002) ("[P]romissory estoppel does not apply if the terms of the promise are indefinite.").

Plaintiff's theory for relief is as follows. According to the Amended Complaint, Plaintiff believed CRMSuite was an approved CRM product because

GM for years had "knowingly permitted" it to be made available on its vendor advisor site through third-party pipelines. Dkt. 38 ¶ 61. Plaintiff then "changed its position in reliance on General Motors' conduct by selling and servicing its CRMSuite product, including adding additional functions only required by General Motors . . . at great expense to Plaintiff." Dkt. 38 ¶ 65. After Plaintiff informed GM that it was planning to sell to dealers through its own pipeline, GM's staff notified Plaintiff it would need to add eight new functions to its software. *Id.* ¶ 70. The complaint then states GM's staff "at all times" represented to Plaintiff by "words and actions" that its customers would keep receiving sales leads if Plaintiff completed the necessary upgrades. *Id.* ¶ 76–77.

But nowhere in the Amended Complaint does Plaintiff point to an affirmative promise by a GM employee guaranteeing that CRMSuite would be approved for standalone use. The above allegations, instead, suggest Plaintiff inferred its product was GM-approved based on GM previously allowing it on the vendor site (through a third-party) and inferred, based on the representations of GM employees, it would remain as such following completion of the necessary upgrades. The Complaint, however, does not provide any details of these representations or the context in which they were made.

As plead, the Amended Complaint suggests Plaintiff made an inference based on conduct, not a promise, and thus does not "raise a right to relief above [a]

speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see, e.g.*,

*Sapphire Int'l Grp., Inc. v. Allianz Glob. Risks US Ins. Co.*, No. 18-Civ-80101,

2018 WL 8344837, at *3 (S.D. Fla. June 29, 2018) (dismissing promissory

estoppel claim for lack of affirmative promise where defendant, an insurance

company, made a "partial settlement payment" and made representations during

phone call that left insured to believe "there was no doubt that the claim would be

covered"). Count V is thereby dismissed. Should Plaintiff choose to replead, it

must allege in detail that a GM employee made an affirmative promise that it then

relied upon.

### F.  GM's Motion to Strike

Defendant GM moves to strike paragraphs 19–23 and the first clause of

paragraph 24 of the Amended Complaint as immaterial, impertinent, and

scandalous. Dkt. 43. These paragraphs contain references to fines GM paid to the

U.S. Department of Justice and other government entities for unlawful business

practices it engaged in from 2014–16. GM argues these paragraphs are wholly

unrelated to the present litigation and prejudicial. *Id.* at 4–6.

Federal Rule of Civil Procedure 12(f) provides that a "court may strike from

a pleading an insufficient defense or any redundant, immaterial, impertinent, or

scandalous matter." Motions to strike are considered drastic and generally

disfavored. *Exhibit Icons, LLC v. XP Cos., LLC*, 609 F. Supp. 2d 1282, 1300 (S.D.

Fla. 2009). For that reason, motions to strike typically will be denied "unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." *Moreno v. Moore*, No. 3:18-cv-1472-J-25JBT, 2020 WL 3051319, at \*1 (M.D. Fla. June 8, 2020) (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed. 1998)). At the pleading stage, "[p]rejudice results when the matter complained of has the effect of confusing the issues or where it is so lengthy and complex that it places an undue burden on the responding party." *S.D. v. St. Johns Cnty. Sch. Dist.*, No. 3:09–cv–250–J–20TEM, 2009 WL 1941482, at \*3 (M.D. Fla. July 7, 2009) (internal citation omitted).

Defendant GM has not met this high standard, notwithstanding the gratuitous nature of these allegations. The core issue here is whether GM acted unfairly in its commercial dealings with Plaintiff. Examples of GM's other deceptive or unfair acts, though not directly related to this case, provide some context for this inquiry, but in the main do not benefit Plaintiff. GM's main concern seems to be the prejudicial effect these allegations may have in that they might cause a jury to reach an unwarranted inference at trial. Dkt. 43 ¶ 6. This does not amount to undue prejudice at the pleading stage. GM's concerns, though they may prove warranted, are premature and will be better addressed later by a motion

24

in limine. *See Harris v. Torus Nat. Ins. Co.*, No. 8:14-cv-1001-T-33AEP, 2014 WL 3053257, at *3 (M.D. Fla. July 7, 2014). The motion to strike is denied, but if Plaintiff chooses to replead, it would do well to reconsider these extrinsic, and likely unnecessary, allegations.

### IV. CONCLUSION

Defendant Aquent's Motion to Dismiss (Dkt. 41) is **GRANTED.** Defendant General Motors' Motion to Dismiss (Dkt. 42) is also **GRANTED**, and its Motion to Strike (Dkt. 43) is **DENIED.** Plaintiff, if it so chooses, must file an amended complaint within 14 days that cures the deficiencies outlined in this Order.

**DONE AND ORDERED** at Tampa, Florida, on October 5, 2020.

/s/ William F. Jung
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record