## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CRMSUITE CORPORATION, a
Florida corporation,

      Plaintiff,

                                        Case No: 8:20-cv-00762-WFJ-AAS

v.

GENERAL MOTORS COMPANY,
A Delaware corporation;
GENERAL MOTORS, LLC,
a Delaware limited liability company; and
GENERAL MOTORS HOLDINGS LLC,
a Delaware limited liability company,

      Defendants.

_____/

### THIRD AMENDED COMPLAINT

      Plaintiff, CRMSuite Corporation ("Plaintiff"), sues Defendants, General Motors Company ("GM Co."), General Motors LLC ("GM LLC"), and General Motors Holdings LLC ("GM Holdings") (collectively, "General Motors"),[1] and in support thereof states as follows:

### JURISDICTION AND VENUE

      1.      Plaintiff is a Florida corporation with its principal office located in Sarasota County, Florida.

      2.      GM Co. is a Delaware corporation doing business in Florida.

      3.      GM LLC is a Delaware limited liability company doing business in Florida.

      4.      GM Holdings is a Delaware limited liability company doing business in Florida.

---

[1]      Plaintiff does not bring any claims against Aquent, LLC in this Third Amended Complaint.

5.      GM Co., GM LLC, and GM Holdings blur the lines between the three entities, if such lines exist, by consistently referring to "General Motors" as the entity.

6.      This Court has jurisdiction over this matter pursuant to the removal of the matter to this Court from the Circuit Court of Manatee County, Florida.

7.      Venue in this Court is appropriate as the causes of action accrued in this district, including the claims subject to FLA. STAT. § 542.30.

8.      All conditions precedent to maintaining this suit have been met or otherwise waived.

9.      Plaintiff has retained the undersigned attorneys and is responsible for the reasonable fees associated with the legal services rendered in this action.

## FACTUAL BACKGROUND

10.      Plaintiff is a Sarasota-based business that provides customer relationship management (CRM) software to automobile dealers.  The CRM software allows auto dealers to seamlessly and efficiently manage their customer leads and marketing needs, including leads generated through their websites.  Plaintiff has automobile dealer customers in all the major brands of manufactured vehicles.

11.      The primary label Plaintiff used to sell its software product to dealers during the times material to this action is the eponymous "CRMSuite."

12.      Many of Plaintiff's customers are multi-manufacturer brand dealerships.  These customers use the same CRM software to support their sales and marketing efforts at many, if not all, of their dealerships regardless of brand.  Until recently, several of Plaintiff's multiple brand customers and prospects have some General Motors stores as part of their dealership portfolio.

2

13.     General Motors adopted a Winning with Integrity tagline to describe its Code of Conduct in approximately 2018.  As part of that code, General Motors pledged to maintain ethical relationships with third parties, practice due diligence, and treat third parties fairly.

14.     As set forth more fully below, General Motors did not live up to its own Code of Conduct in its dealings with Plaintiff, but instead engaged in deceptive and unfair trade practices, breached its contract with Plaintiff, and otherwise reneged on its promises to Plaintiff.

15.     General Motors artificially restricts the number of CRM vendors available to auto dealers who sell its products through a vendor certification program it currently calls the Dealer Vendor Management Program and formerly called the Dealer Technology Assistance Program.

16.     General Motors purports to publish a list of CRM software products that it has certified through its vendor program on a Dealer Vendor Advisor website.

17.     When a General Motors dealer installs a certified CRM software product into its systems, part of that process involves the dealer contacting General Motors in order to have General Motors start sending sales leads, including sales leads generated from the dealer's own website, and other data from General Motors' systems when the dealer accesses the CRM platform on their computers.

18.     Unless a dealer uses a CRM product that is available through the participating CRM vendor program, General Motors will not deliver customer sales leads, other data, or performance bonuses to the dealer.

19.     General Motors requires any CRM vendors who wish for their product to be available through the participating CRM vendor program to either integrate a connector server as a data communications pipeline, also simply referred to as a "pipeline," between General Motors' computer systems and the CRM software, or to use an existing connector server pipeline.

20.     General Motors further requires, in addition to integrating a connector server, CRM vendors who wish for their product to be available through the participating CRM vendor program to pay a regular fee to General Motors.

21.     There are essentially two certification levels of General Motors' vendor certification program: a basic certification level and a premium certification level that allows dealer customers of a CRM vendor's software product to receive subsidies from General Motors that cover the cost of the CRM product.

22.     Developing software that qualifies for the premium-level certification of General Motors' vendor program is a time intensive and expensive process that requires a CRM vendor to work with General Motors' information and technology staff (hereinafter, "IT staff"), provided by the company Aquent, LLC, to add and demo about eight additional functions into the software.

23.     The nature of the eight additional functions required for the premium level of General Motors CRM product certification are such that CRM vendors can use those features only for General Motors dealers.

24.     What Plaintiff did not know until recently is that General Motors apparently reserves the right to arbitrarily deny a CRM vendor from participating in the CRM vendor program at the premium level even after the vendor has already incurred the time and expense of working with General Motors' IT staff to integrate software with General Motors' systems, and the IT staff has "certified" the successful completion of the integration from a technological standpoint.

25.     Plaintiff's CRM software product has been a certified product available through the participating CRM vendor program from 2016 to 2020.

26.     Plaintiff's software product was previously owned by iMagic Lab LLC.

4

27.     iMagic Lab had a connector server integrated with General Motors' computer systems as well as an independent arrangement with General Motors for the payment of the regular fee for the vendor program under a written contract with General Motors.

28.     A true and correct copy of iMagic Lab's Dealer Technology Assistance Program Agreement (hereinafter, "DTAP Contract") with GM Holdings, which had an effective date of August 9, 2013, is attached hereto as **Exhibit A**.[2]

29.     The DTAP Contract was freely assignable by iMagic Lab.  Exhibit A at §§ II.B. ("Service Provider understands and agrees that this Certification Program is non-exclusive and shall be made available to all service providers of Dealers.") & XXV (stating the requirements for General Motors to assign the contract, but silent as to the vendor's right of assignment).

30.     The term of the DTAP Contract consisted of an initial five-year term and two successive one-year terms upon renewal from General Motors.  Exhibit A at §§ I & XV.

31.     iMagic Lab's software product received certification through the General Motors participating CRM vendor program and had been available through the participating CRM vendor program since about the year 2013.

32.     iMagic Lab transferred the intellectual property rights in the software product, ownership of the connector server, and its General Motors contract to Plaintiff.

33.     Plaintiff renamed the software product to the eponymous "CRMSuite" after receiving ownership of the software from iMagic Lab.

---

[2]     Plaintiff is omitting immaterial exhibits and attachments to the DTAP Contract and instead attaching only those portions necessary to provide notice of the nature of its contract claim against GM Holdings.

34.    The software itself, which General Motors had already certified, did not change notwithstanding the transfer of ownership from iMagic Lab to Plaintiff and Plaintiff changing the product's name to CRMSuite.

35.    Plaintiff's Chief Executive Officer Richard Keith Latman notified multiple General Motors employees via e-mail on April 15, 2016 of the transfer of the DTAP Contract from iMagic Lab to Plaintiff, that the iMagic Lab business name was out of date, and that the software product's name was now CRMSuite:

> **From:** Richard Keith Latman [mailto:rklatman@imagiclab.com]
> **Sent:** Friday, April 15, 2016 9:34 AM
> **To:** Robert J. Wheeler <robert.j.wheeler@gm.com>
> **Cc:** David Denison <ddenison@imagiclab.com>; Judy Walerski (C) <judy.walerski@gm.com>
> **Subject:** Re: Tracking
>
> Have you guys updated our name yet? The product is now known as CRMSuite...

A true and correct copy of that e-mail correspondence is attached to this Complaint as **Exhibit B**.

36.    General Motors employee Randall Straughen then stated via e-mail:

> On Fri, Apr 15, 2016 at 9:56 AM, Randall Straughen (C) <randall.straughen@gm.com> wrote:
>
> Just send me a graphic and whatever verbiage you would like and I will make sure the DVA gets updated.  Thanks!

Exhibit B.

37.    General Motors employee Rob Van Goethem then advised Mr. Latman via e-mail that the CRMSuite now appeared on the Dealer Vendor Advisor website:

> **From:** Rob Van Goethem (C)
> **Sent:** Friday, April 15, 2016 11:26 AM
> **To:** Randall Straughen (C) <randall.straughen@gm.com>
> **Subject:** RE: FW: Tracking
>
> Here is how it looks now:





Thanks,
Rob
_____
Rob Van Goethem
586-243-5260 | rob.vangoethem@gm.com

Retail
Sales & Marketing
Support Team

*Helping Build Loyalty & Advocacy*

Exhibit B.

38.     Starting on or about April 15, 2016, General Motors in fact listed "CRMSuite" as a certified product on the Dealer Vendor Advisor website, accepted the assignment of iMagicLab's DTAP Contract to Plaintiff, and acknowledged Plaintiff's status as a participating CRM vendor.

39.     Plaintiff has performed its material obligations under the DTAP Contract and stands ready, willing, and able to continue doing so if not for General Motors' conduct effectively shutting it out of the participating CRM vendor program prior to termination of the DTAP Contract.

40.     Plaintiff used the connector server pipeline transferred to it by iMagic Lab from 2016 to about March 2018 to service General Motors dealers who used its product.

41.     Beginning around November 2017, Plaintiff entered a reseller relationship with Dominion Dealer Services, LLC ("Dominion").

42.     Dominion received the right to resell Plaintiff's software product under the label "Vision powered by CRMSuite" as part of a mutually beneficial marketing effort between the two businesses.

43.     Dominion and Plaintiff agreed that Plaintiff could continue to directly market and service its software product to General Motors dealers under the CRMSuite label.

44.     At the time Plaintiff entered the reseller relationship with Dominion, Dominion had its own connector server pipeline for its software product named Autobase, another certified General Motors CRM product, but Dominion planned to and did in fact retire the Autobase software during the time that Plaintiff used its pipeline.

45.     Plaintiff transitioned its customers to Dominion's connector server pipeline simply for convenience so Plaintiff did not have to maintain two pipelines to General Motors' systems.

46.     Plaintiff and Dominion notified General Motors in January 2018 regarding their intent to use only the existing Dominion connector server as the pipeline for both the CRMSuite and Vision labels of Plaintiff's software product going forward.

47.     General Motors approved the use of only the existing Dominion pipeline connector server for both the CRMSuite and Vision labels of Plaintiff's product.

48.     General Motors further approved the payment of only one regular fee for both the CRMSuite and Vision labels of Plaintiff's product.

49.     General Motors' approval of Plaintiff and Dominion's use of one connector server and one regular fee to sell and service Plaintiff's software product to General Motor dealers was communicated to Plaintiff, among other ways, through a January 18, 2018 e-mail to Plaintiff's

employee Patrick Geddie from Dominion Product Manager John Hardacre stating that Mr. Hardacre would be "working as the Dominion tech liaison with GM on the DTAP integrations for CRMSuite" and that Mr. Hardacre "was asked," by General Motors, "to send you the up to date integration documents." A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit C**.[3]

50.   General Motors' approval of Plaintiff's use of only the existing Dominion pipeline was further communicated through a February 13, 2018 e-mail to Mr. Geddie from Mr. Hardacre:

> Patrick,
>
> *I've been speaking with Keith and he recommended I get with you to schedule a hand-off meeting for an integration between Autobase and CRMSuite for delivering GM leads to your GM customers.* As you know, GM is no longer going to deliver their leads to CRMSuite as of 3/31/18. We are working to get the product in the DTAP program under the Dominion umbrella. However, there's no way for that to occur before the end of March.
>
> *Therefore, GM has given us permission to put Autobase in your GM dealerships along with CRMSuite. The dealer won't use Autobase, but leads will be delivered to Autobase and then made available to CRMSuite.* This allows the dealers to receive leads from a DTAP certified tool, but can still work them in CRMSuite. We already have web services in place to deliver leads and receive dispositions. We just need to iron out some details with you. Also, there's a new integration that GM recently added that we'd need to add. This will require you to send us all non-GM leads (phone ups, walk-ins, credit leads, everything) on a nightly basis. . . .
>
> **John Hardacre**
> Product Manager
> Dominion Autobase
> **Dominion Dealer Solutions**

A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit D** (emphasis added).

51.   Since Dominion Product Manager Mr. Hardacre made express statements regarding what General Motors had "asked" and given "permission" for Plaintiff and Dominion to do,

---

[3]      Immaterial attachments to the e-mail have been omitted.

Plaintiff reasonably relied on the fact that that General Motors had authorized Mr. Hardcare to speak on its behalf with regard to the topics he discussed in his e-mails to Plaintiff. Notably, General Motors never disputed or otherwise corrected Mr. Hardacre's statement concerning General Motors' permission.

52.     Based on the circumstances of Mr. Hardacre's e-mails to Plaintiff, Plaintiff reasonably relied on the fact that Mr. Hardcare had apparent authority to and was in fact making statements on behalf of General Motors in that e-mail correspondence, or at least confirming statements made by General Motors representatives, which were also confirmed to Plaintiff directly.

53.     General Motors confirmed in a March 9, 2018 e-mail to Plaintiff that referred to Plaintiff as a "DTAP CRM" that Plaintiff's software product, specifically the CRMSuite label, had continuing certification for use by General Motors dealers as part of request to confirm that Plaintiff was ready to activate a new dealer customer's use of the product:

> Dear DTAP CRM,
>
> Please verify that this is your dealer and they would like to use your DTAP CRM. If so, are they ready to be activated?
>
> Please reply to this email with your confirmation.
>
> Requested DTAP CRM: CRM SUITE . . . .
>
> Sincerely,
>
> Certified Internet Dealer Support Team
> cidenrollments@gm.com

A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit E**.

54.     General Motors also in at least one case communicated directly with a dealer in March 2018 and acknowledged that General Motors would be delivering sales and service leads to the CRMSuite platform:

Good day.

We have received your request yesterday to change your DTAP CRM provider from AUTOBASE to CRM SUITE. We have requested confirmation from CRM SUITE to know if your dealership is ready to accept sales and service leads on their CRM. However, they have responded that your dealership is not active on their system at this time. We would request that you please contact CRM SUITE to have this matter clarified so that we will be able to change your DTAP CRM at the earliest possible time.

Sincerely,

Certified Internet Dealer Support Team
cidenrollments@gm.com

See a true and correct copy of e-mail correspondence attached hereto as **Exhibit F**.

55.     General Motors also renewed Plaintiff's DTAP Contract for the first time during the time that Plaintiff and Dominion consolidating the CRMSuite and Vision labels of Plaintiff's product into a single connector server pipeline.

56.     As part of Dominion and Plaintiff's use of a single connector server and a single regular fee for both the CRMSuite and Vision labels of Plaintiff's software product, however, General Motors required Plaintiff to upgrade its software to include the eight additional functions it required for premium-level certification.

57.     General Motors' requirement that Plaintiff upgrade its software to qualify for premium-level certification was communicated, among other ways, through Dominion Project Manager Mr. Hardacre, *see* Exhibits A & B, and by the General Motors IT staff directly.

58.     The General Motors IT staff repeatedly stated that if Plaintiff completed the integration of the additional features, then Plaintiff's software product would approved through the participating CRM vendor program at the premium level.

59.     General Motors' statements that Plaintiff's software product would be certified at the premium level if it completed the integrations occurred during multiple telephonic meetings, referred to as "kick off" meetings, that occurred at discrete steps of the integration process and in dozens if not hundreds of e-mails.

60.     For example on November 12, 2019, Anthony Fava, a member of the General Motors IT staff, congratulated Plaintiff's employee Mr. Geddie and Mr. Hardacre of Dominion on completion of the testing phase for one of the integrations, and directed them to "continue integration and validation of all other required integrations for the Premium CRM category."  A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit G**.

61.     Also on November 12, 2019, Bradley Zabinksi, another member of the General Motors IT staff, stated the following to Plaintiff's employee Mr. Geddie, in response to Mr. Geddie questioning what Plaintiff needed to complete as the next steps for the premium certification, as part of a larger e-mail chain that also refers to one of the kick off meetings where Plaintiff and General Motors' IT staff verbally discussed the certification process:

> The next steps should be very clear.  Finish the other integrations and then we can move on to DCDE customer search.
>
> You don't have to release them to production.  Just complete them, do GM IT Certification for them and then the demo.
>
> After they are finished (GM IT Certification complete and demo complete) we have a kick off meeting for the DCDE Customer search.
>
> Bradley Zabinski
> **A Q U E N T -** Integration Support Manager
> 100 Renaissance Center, Detroit, MI  48265
> Floor 12, Cube D36 – Mail Code : 482-A12-D36
> T +1 313-329-5480
>  bradley.zabinski@gm.com
> Supporting – Dealer Technology Enablement - Dealer Business Solutions

A true and correct copy of that e-mail correspondence is attached hereto as **Exhibit H**.

62.     General Motors also renewed Plaintiff's DTAP Contract for the second time during the time that Plaintiff was performing the integrations of the additional functions to its software necessary for premium certification from a technological standpoint.

63.     Plaintiff, with Dominion's assistance, worked with the General Motors IT staff to integrate the additional functions to Plaintiff's software.

64.     Plaintiff successfully completed integration of multiple of the eight additional functions to its software necessary to receive premium-level certification of its software product.

65.     Plaintiff has incurred over $300,000 to date to add the additional functions to its software.

66.     At no point in any verbal or written communications from the General Motors IT staff to Plaintiff's employees was it disclosed that General Motors reserved the right to deny Plaintiff's software product premium status even if Plaintiff completed all of the necessary integrations of its software with General Motors from a technological standpoint.

67.     Plaintiff and Dominion originally scheduled Dominion's existing connector server pipeline to shut off on March 31, 2020 in anticipation of Plaintiff's software receiving premium-level certification.

68.     Dominion and Plaintiff negotiated and agreed, on an amicable basis, to end their relationship.

69.     Plaintiff and Dominion agreed as part of the termination of their business relationship that Dominion's customers of the Vision label of Plaintiff's software product that Dominion resold would become Plaintiff's direct customers.

70.     Dominion notified General Motors that it and Plaintiff were ending their business relationship.

71.     Without explanation, General Motors ceased all communications with Plaintiff regarding its product enhancements after being informed that Dominion and Plaintiff were ending their business relationship.

13

72.     The General Motors IT staff also canceled a demonstration of completion of integration of one of the additional functionalities to Plaintiff's software that was scheduled to take place in the first full week of February 2020.

73.     Plaintiff made several attempts to communicate with General Motors to inquire about the status of the premium certification process, but received only silence in response.

74.     General Motors' abrupt termination of all communications with Plaintiff also quickly created a desperate situation for Plaintiff and its General Motors dealer customers with regard to the existing certification of Plaintiff's software.

75.     The desperation arose from the fact that the original plan to shut down Dominion's connector server pipeline would have resulted in the termination of sales leads and other data flowing to dealer customers who used Plaintiff's product unless that information could flow through another connector server pipeline.

76.     Between February and March 2020 General Motors IT staff members corresponded directly with dealer customers of both the Vision and CRMSuite labels of Plaintiff's software product, falsely represented to those dealers that Plaintiff's CRMSuite software product was not and would not be certified by General Motors, and directed the dealers to start using one of the other products listed on the Dealer Vendor Advisor website.

77.     Dominion and Plaintiff separately agreed to extend the shut off date of the Dominion pipeline in order to provide Plaintiff additional time to attempt to get General Motors to honor its existing certification of Plaintiff's software product and its promises that Plaintiff's software would receive premium-level certification if it added the functions to the General Motors IT staff's technological specifications.

78.    Plaintiff was ready, willing, and able to continue making the regular fee payments to General Motors and ensure that there was an active connector server pipeline for its product.

79.    However, the extension of the Dominion pipeline shut off date proved unavailing.

80.    General Motors refused to engage with Plaintiff, but instead elected to dishonor its commitments to Plaintiff and to otherwise continue in its course of unfair and deceptive conduct against Plaintiff with regard to its CRM vendor program.

81.    General Motors effectively shut Plaintiff out from the benefits of the participating CRM vendor program notwithstanding that the DTAP Contract had not yet expired.

82.    GM Holdings has never given the required written notice of termination of the DTAP Contract.

83.    General Motors' effective termination of Plaintiff from the participating CRM vendor program constitutes a material breach by GM Holdings of the DTAP Contract.

84.    GM Holdings' breach of the DTAP Contract has caused Plaintiff to suffer damages including the expenses to Plaintiff from General Motors forcing it to add additional functions to its software while the DTAP Contract was in effect and the loss of business from General Motors premature and abrupt termination of the DTAP Contract.

85.    Plaintiff has subsequently learned that even if Plaintiff had completed the entire integration process for the additional functionalities, Plaintiff was still at risk of not becoming a participating CRM vendor because General Motors retains the right to refuse to approve a software product for inclusion in the participating CRM vendor program even after a vendor satisfies all of General Motors' requirements for certification from a technological standpoint.

86.    The General Motors IT staff encouraged Plaintiff to expend substantial resources even though General Motors apparently had no interest in doing business with Plaintiff.

87.     Plaintiff reasonably relied on the fact that General Motors had already certified its software product and approved it for use through the participating CRM vendor program based on Mr. Van Goethem's acceptance of the transfer of certification from iMagic Lab to Plaintiff; the listing of the name CRMSuite on the Dealer Vendor Advisor website; the e-mails from the General Motors Certified Internet Dealer Support Team referring to Plaintiff as a DTAP CRM; and the fact that General Motors in fact made Plaintiff's software product available for use by its dealers through the participating CRM vendor program from 2016 onward.  Exhibits B-E.

88.     Plaintiff changed its position in reasonable reliance on General Motors' statements and conduct by selling and servicing the CRMSuite label of its product and entering a business relationship with Dominion to resell the Vision label of its product to General Motors dealers from 2016 to the present.

89.     Plaintiff's reasonable change in position caused by General Motors' statements and conduct has been to its detriment now that General Motors purports to deny that Plaintiff's software product has, is, or ever will be part of the participating CRM vendor program and has caused dealers to decline to do business with Plaintiff based on threats of withholding sales leads, other data, and bonuses if they use Plaintiff's product.

90.     Separate and apart from any existing certification of Plaintiff's product, Plaintiff also reasonably relied on the fact that if it completed the integration of the eight additional functions to its software from a technological standpoint then General Motors would grant Plaintiff premium status through the participating CRM vendor program based on the General Motors IT staff's verbal statements at multiple kick off meetings; Mr. Fava's statements via e-mail directing Plaintiff to continue the integrations for the Premium CRM category; and Mr. Zabinski's statements via e-mail describing what steps are required for GM IT Certification.  Exhibits G-H.

91.     Plaintiff changed its position in reasonable reliance on the statements of the General Motors IT staff by incurring the substantial expense of integrating additional functions to its software that cannot be used for any purpose other than for servicing General Motors dealers.

92.     Plaintiff's reasonable change in position caused by General Motors' statements has been to its detriment now that General Motors has abruptly terminated the integration process, stated to General Motors dealers that Plaintiff's software product will not be certified at any level, and otherwise expressed that it has no interest in doing business with Plaintiff.

93.     General Motors purports to provide CRM vendors a thing of value in the form of offering a membership, credential, or certificate through the CRM vendor program in exchange for providing a product that includes certain functions that meet their own specifications and for paying a regular fee.

94.     Plaintiff is a consumer of the CRM vendor program because it incurred substantial time and expense to add the functions required by General Motors to its product, and Plaintiff stands ready, willing, and able to pay the regular fee and provide an active connector server required for participation in the vendor program.  In return, Plaintiff would receive full access to General Motors dealers for the provision of Plaintiff's services, which, had General Motors completed the process for Plaintiff's premium certification, would have been subsidized by General Motors.

95.     Dealers of General Motors automobile products are also consumers of General Motors' CRM vendor program because General Motors requires them to use CRM products approved through its vendor program in order to receive sales leads, bonuses, and other benefits from General Motors.

96.     General Motors engaged in deceptive and unfair practices against Plaintiff with respect to their CRM vendor program because its IT staff stated that Plaintiff's software product would be certified if it complied with General Motors' requirements, and General Motors' IT staff in fact worked with Plaintiff to substantially complete those requirements, notwithstanding General Motors' undisclosed policy that it reserves the right to deny a vendor participation in the CRM vendor program even after the vendor incurs the time and expense of meeting the technical requirements for certification.

97.     Plaintiff has been aggrieved and has suffered damages as a result of General Motors' unfair and deceptive conduct with respect to the CRM vendor program.

98.     Plaintiff's damages as a result of General Motors' unfair and deceptive conduct with respect to the CRM vendor program consist of the expenses it incurred to add the functions to its software specified by General Motors and to integrate a connector server with General Motors' computer systems, which costs exceed $300,000, in reasonable reliance on General Motors' promises that Plaintiff's product would be certified if it completed that process from a technological standpoint.

99.     General Motors induced Plaintiff to incur those substantial expenses as a prerequisite for it to receive premium status through the participating CRM vendor program.

100.    General Motors' conduct is unfair and deceptive because it apparently has a general policy, which was not previously disclosed to Plaintiff, of reserving the right to deny certification to CRM vendors even after the integration process is completed from a technological standpoint, and General Motors asserted that it has no interest in doing business with Plaintiff specifically.

101.    Dealers have also been aggrieved and have suffered damages as a result of General Motors' unfair and deceptive conduct against Plaintiff with regard to the CRM vendor program

because former dealer customers of Plaintiff are now having to pay a higher price, sometimes two to three times higher, for using a competing CRM product to the one that Plaintiff provided them.

102.    General Motors' unfair and deceptive conduct against Plaintiff with regard to the participating CRM vendor program has rendered the service valueless to Plaintiff, therefore entitling Plaintiff to recovery of the purchase price of membership in the CRM vendor program, which includes the expenses incurred to qualify for the program.

103.    General Motors has additionally told dealers that they may not even use Plaintiff's products in addition to other CRM products which are listed as approved through the CRM vendor program.

104.    General Motors' conduct has caused Plaintiff to lose a substantial part of its existing business with General Motors dealers and its prospective business with dealer customers of Dominion who used the Vision label of its product.

105.    General Motors has claimed that it has not added any new participating CRM vendors in a few years and presently has no intention of adding any more as an ostensible justification for General Motors abruptly disclaiming Plaintiff's existing certification and terminating the process to certify Plaintiff's software at the premium level.

106.    General Motors' claim that it is not adding new dealers is not consistent with the language in its own DTAP Contract that "the Certification Program is non-exclusive and shall be made available to all service providers of Dealers."  Exhibit A at § II.B.

107.    Moreover, General Motors has substantially invested in another vendor, Tekion, that in February 2020 announced a new "flagship product," the Automotive Retail Cloud, that is a "cloud-native retail platform, including all functionalities of a Dealer Management System."[4]

108.    The Tekion press release states that its "most recent funding round was led by General Motors," and includes the following statement from Steve Hill, U.S. Vice President of Sales, Service, and Marketing at General Motors: "Managing all of the information flowing in and out of dealerships using cloud-based systems is the future and we are excited about Tekion's state-of-the-art solutions to help drive higher customer satisfaction and overall dealer performance."[5]

109.    Plaintiff accordingly seeks declaratory relief and damages against General Motors for violation of the Florida Deceptive and Unfair Trade Practices Act, damages against GM Holdings for breach of contract, and damages against General Motors under the doctrine of promissory estoppel.

## COUNT I
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT AGAINST GENERAL MOTORS

110.    CRMSuite incorporates paragraphs 1 through 109 as though fully set forth herein.

111.    This is an action by Plaintiff for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") against all Defendants.

112.    FDUTPA prohibits unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce.

---

[4]     *Tekion Set to Disrupt Automotive Industry by Launching Automotive Retail Cloud, the First Cloud-Native Retail Operating Platform (AKA DMS)*, BUSINESSWIRE, https://www.businesswire.com/news/home/20200211005428/en/Tekion-Set-to-Disrupt-Automotive-Industry-by-Launching-Automotive-Retail-Cloud-The-First-Cloud-Native-Retail-Operating-Platform-AKA-DMS (Feb. 11, 2020).

[5]     *Id.*

113.     Plaintiff is a legitimate business enterprise protected by FDUTPA.

114.     General Motors engages in a trade or commerce by advertising, soliciting, providing, offering, and/or distributing a certification program for CRM software vendors as a thing of value.

115.     The General Motors CRM vendor program qualifies as a thing of value because it is a membership, credential, certificate, benefit, and/or professional opportunity that General Motors offers to CRM software vendors in exchange for the vendors incurring the expense of integrating certain software functionalities to qualify for the program and paying General Motors a regular fee.

116.     Plaintiff is a consumer of the General Motors CRM vendor program because the General Motors IT staff stated to Plaintiff that its product would receive premium status if it completed certain technical requirements, Plaintiff incurred expenses to complete those requirements, and Plaintiff was ready, willing, and able to continue paying the vendor program fee and to ensure an active connector server pipeline for its product.

117.     Dealers who sell General Motors products are also consumers of the CRM vendor program because General Motors requires them to purchase CRM products certified through its own vendor program.

118.     General Motors, by its actions set forth above, engaged in unconscionable acts and practices in the conduct of trade and commerce by, inter alia:

    a.   Making affirmative statements verbally and in e-mails that Plaintiff's software product would be available to dealers through the participating CRM vendor program if it completed the integrations of its software with General Motors' systems from a technological standpoint.

b. Failing to disclose to Plaintiff that General Motors reserved the right to deny Plaintiff participation in the participating CRM vendor program even if Plaintiff completed the requirements for certification from a technological standpoint.

c. Inducing Plaintiff to incur substantial time and expense to add multiple functions to its software product notwithstanding the fact that General Motors now claims that they never intended to allow General Motors auto dealers to receive sales leads, bonuses, and other benefits if they used Plaintiff's CRM product regardless of whether Plaintiff completed the addition of those functions or not.

d. Falsely representing to General Motors auto dealers that Plaintiff's software is not approved through the participating CRM vendor program at any certification level, notwithstanding earlier acknowledgments of same and the fact that Plaintiff's software product has been available to General Motors dealers through the program continuously and consistently from 2016 to 2020.

e. Threatening to withhold earned performance bonuses from General Motors auto dealers unless they terminate their contracts with Plaintiff or decline to contract with Plaintiff.

f. Threatening to withhold leads generated through the General Motors dealers' web sites—which are captured by General Motors—unless they terminate their contracts with Plaintiff or decline to contract with Plaintiff.

g. Refusing to communicate with Plaintiff from February 2020 onward after General Motors IT staff had communicated directly with Plaintiff's employees for months while Plaintiff added the additional functions required by General Motors—at hundreds of thousands of dollars expense to Plaintiff—as General Motors made the

calculated decision to refuse to allow Plaintiff to complete the demonstration scheduled for the first week of February and to instead set out to destroy Plaintiff's relationships and contracts with General Motors auto dealers.

119.    General Motors' unfair, deceptive, and unconscionable actions have rendered the service of its participating CRM vendor program valueless to Plaintiff and caused Plaintiff to suffer damages in the form of the expenses that it incurred to upgrade its software as a prerequisite to membership in the participating CRM vendor program.

120.    General Motors' unfair, deceptive, and unconscionable actions have also caused auto dealers to suffer injury because they must pay a higher price, in some cases two to three times higher, for a similar kind of CRM product and service that Plaintiff offers.

WHEREFORE, Plaintiff demands entry of a judgment against General Motors declaring that General Motors' above-described actions violate FDUTPA; awarding Plaintiff damages, prejudgment interest, attorneys' fees, and costs; and awarding such other and further relief as the Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT AGAINST GM HOLDINGS

121.    Plaintiff hereby realleges and reincorporates by reference the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

122.    This is an action by Plaintiff against GM Holdings for breach of contract.

123.    A valid and enforceable contract exists between Plaintiff and GM Holdings in the form of the DTAP Contract.  Exhibit A.

124.    Plaintiff is a property party to enforce the DTAP Contract because iMagic Lab assigned the contract to Plaintiff and GM Holdings accepted that assignment.

125.    Plaintiff fully performed its material obligations under the DTAP Contract.

126.    GM Holdings materially breached the DTAP Contract by effectively terminating Plaintiff's participation in the CRM vendor program notwithstanding that the second renewed term of the DTAP Contract had not yet expired.

127.    GM Holdings' material breach of the DTAP contract caused Plaintiff to suffer damages including the expenses to Plaintiff from General Motors forcing it to add additional functions to its software while the DTAP Contract was in effect and the loss of business from General Motors' premature and abrupt termination of Plaintiff's participation in the CRM vendor program.

WHEREFORE, Plaintiff demands entry of a judgment against General Motors awarding Plaintiff damages, prejudgment interest, and costs and awarding such other and further relief as the Court deems just and proper.

## COUNT III
## PROMISSORY ESTOPPEL AGAINST GENERAL MOTORS

128.    Plaintiff hereby realleges and reincorporates by reference the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

129.    This is an action, in the alternative to Count II, by Plaintiff against General Motors for promissory estoppel.

130.    General Motors made an affirmative promise to Plaintiff that its software product was approved for use by General Motors dealers through the participating CRM vendor program.

131.    General Motors' promise that Plaintiff's software product is approved through the participating CRM vendor program is reflected, among other ways, by the following:

a.    General Motors employee Mr. Goethem accepting the transfer from iMagic Lab to CRMSuite on April 15, 2016 and stating to Plaintiff's CEO Mr. Latman that the

name CRMSuite would be listed on the Dealer Vendor Advisor website going forward.  Exhibit B.

b.  General Motors listing the CRMSuite label of Plaintiff's product on its Dealer Vendor Advisor website starting on or about April 15, 2016.

c.  Dominion Product Management Mr. Hardacre's January 18, 2018 e-mail to Plaintiff stating that Dominion would act as Plaintiff's liaison with General Motors. Exhibit C.

d.  Dominion Product Manager Mr. Hardacre's February 13, 2018 e-mail to Plaintiff communicating the permission of General Motors for Plaintiff to continue selling and for dealers to continue using Plaintiff's software product through the Dominion pipeline.  Exhibit D.

e.  The General Motors Certified Internet Dealer Support Team's March 9, 2018 e-mail to Plaintiff stating "Dear DTAP CRM" and asking Plaintiff to confirm a new dealer's activation of the CRMSuite label of its product.  Exhibit D.

f.  The standard language in the DTAP Contract acknowledging "the Certification Program is non-exclusive and shall be made available to all service providers of Dealers."  Exhibit A at § II.B.

g.  The fact that General Motors has made Plaintiff's software product, regardless of its label, available to dealers through the participating CRM vendor program and delivered sales leads and other data to dealers who use Plaintiff's software product continuously and consistently from 2016 to 2020.

132.  General Motors' affirmative promises and conduct are such that General Motors should reasonably expect that Plaintiff would sell and service its software product to General

Motors dealers based on the expectation that its software had already been approved and would continue to be available to dealers through the participating CRM vendor program.

133. Plaintiff changed its position in reasonable reliance on General Motors' statements and conduct by selling and servicing the CRMSuite label of its product and entering a business relationship with Dominion to resell the Vision label of Plaintiff's product to General Motors dealers from 2016 to the present.

134. Plaintiff's reasonable change in position caused by General Motors' statements and conduct has been to its detriment now that General Motors purports to deny that Plaintiff's software product has, is, or ever will be part of the participating CRM vendor program and has caused dealers to cancel their contracts and decline to do business with Plaintiff based on threats of withholding sales leads, other data, and bonuses if they use Plaintiff's product.

135. General Motors' conduct has caused Plaintiff to suffer damages consisting of the expenses to Plaintiff from General Motors forcing it to add additional functions to its software, the loss of a substantial part of its business with General Motors dealers who used the CRMSuite label of its product, and the loss of prospective business with customers of the Vision label of its product resold by Dominion.

136. Injustice can be avoided only by enforcement of General Motors' promises to Plaintiff regarding the fact that Plaintiff's software is already certified.

WHEREFORE, Plaintiff demands entry of a judgment against General Motors awarding Plaintiff damages, prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT IV
## <u>PROMISSORY ESTOPPEL AGAINST GENERAL MOTORS</u>

137.    Plaintiff hereby realleges and reincorporates by reference the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

138.    This is an action by Plaintiff against General Motors for promissory estoppel.

139.    General Motors made affirmative promises to Plaintiff that its product would receive premium status through the participating CRM vendor program if Plaintiff completed the addition and integration of additional features to its software from a technological standpoint.

140.    General Motors' affirmative promise is reflected, among other ways, by the following:

      a.    Verbal statements by the General Motors IT staff at kick off meetings with Plaintiff about the technical integrations required to obtain certification.

      b.    General Motors IT staff member Mr. Fava's statements in his November 12, 2019 e-mail to Plaintiff's employee Mr. Geddie directing Mr. Geddie to "continue integration and validation of all other required integrations for the Premium CRM category."  Exhibit G.

      c.    General Motors IT staff member Mr. Zabinski's statements in his November 12, 2019 e-mail to Plaintiff's employee Mr. Geddie stating that the next steps to obtain certification "should be very clear," including the step to "do GM IT Certification." Exhibit H.

141.    General Motors' affirmative promises were such that it should reasonably expect that Plaintiff would incur the expenses of adding certain functionalities to its software in anticipation of its software product receiving premium status upon completion of those steps from a technological standpoint.

142.     Plaintiff changed its position in reasonable reliance on General Motors' affirmative promises by incurring over $300,000 to add eight functionalities to its software product that cannot be used for any purpose other than for servicing General Motors dealers.

143.     Plaintiff's reasonable change in position has been to its detriment because General Motors abruptly terminated the integration process, stated to General Motors dealers that Plaintiff's product will not be certified, and otherwise expressed that it has no interest in doing business with Plaintiff.

144.     General Motors' conduct has caused Plaintiff to suffer damages consisting of the expenses it incurred to complete the technological steps that General Motors represented were the prerequisites to Plaintiff receiving premium-level CRM vendor status.

145.     Injustice can be avoided only by enforcement of General Motors' promises to Plaintiff that its CRM software product would be certified at the premium level if it completed the development of additional functionalities and the integration of its software with General Motors' systems from a technological standpoint.

WHEREFORE, Plaintiff demands entry of a judgment against General Motors awarding Plaintiff damages, prejudgment interest, costs, and such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues herein triable by jury.

## NOTICE OF INTENT TO SEEK ATTORNEYS' FEES

Plaintiff hereby gives notice of its intent to seek attorneys' fees against General Motors under all applicable statutory and contractual provisions.

Dated: October 29, 2020.

Respectfully submitted,

*/s/ James Jeffrey Burns*
JOHN E. JOHNSON
Florida Bar No. 593000
jjohnson@jclaw.com
JAMES JEFFREY BURNS
Florida Bar No. 111395
jburns@jclaw.com
**JOHNSON, CASSIDY, NEWLON &
DECORT, P.A.**
2802 N. Howard Avenue
Tampa, Florida 33607
Telephone: (813) 699-4859
Facsimile:   (813) 235-0462
*Attorneys for Plaintiff, CRMSuite
Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 29, 2020, a true and correct copy of the foregoing was electronically filed with the United States District Court, Middle District of Florida, by using the CM/ECF System, which will serve a copy on all counsel of record.

*/s/ James Jeffrey Burns*
*Attorney*