## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CRMSUITE CORPORATION,
a Florida corporation,

     Plaintiff,

v.                        Case No. 8: 20-cv-762-WFJ-AAS

GENERAL MOTORS COMPANY,
a Delaware corporation;
GENERAL MOTORS LLC, a Delaware
limited liability company; and
GENERAL MOTORS HOLDINGS LLC,
a Delaware limited liability company,

     Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

     Before the Court is General Motors' ("GM") Motion to Dismiss, Dkt. 59,

Plaintiff CRMSuite's Third Amended Complaint, Dkt. 53. For the reasons below,

the Motion is granted in part and denied in part.

## I. BACKGROUND

     As the Court recounted in its previous order, this case concerns GM's Dealer

Technology Assistance Program ("DTAP"). Through this program, GM certifies

third-party vendors who provide software products to GM auto dealerships.

CRMSuite is a Florida-based software developer that provides customer

relationship management (CRM) software to multi-brand auto dealerships around the country, many of which sell GM vehicles. *Id.* ¶¶ 10–12. CRMSuite filed this lawsuit after, in its opinion, it was wrongfully terminated from GM's vendor program.

### A. GM's Dealer Technology Assistance Program (DTAP).

GM requires its dealerships to use CRM products certified through the DTAP program. *Id.* ¶¶ 15–19. CRM products certified through the program must meet GM's specific technical standards. Dkt. 53-1 at 3. These include security and performance criteria, but most importantly, vendors must integrate their software with GM's systems through a connector server, which acts as a data communications pipeline between GM's computer systems and the CRM software. Dkt. 53 ¶ 19. GM delivers sales leads and performance bonuses to the CRM software and ultimately the dealerships through this pipeline. *Id.* ¶ 18. Without a pipeline, dealers will not receive leads or bonuses. *Id.*

GM offers two tiers of CRM certification: basic and premium. *Id.* ¶ 21. The main difference between the two levels from the vendor's perspective is that premium certification requires the vendor to add several functions to its software that are unique to GM's systems. *Id.* ¶ 23. Adding these functions is a time-consuming and costly process that requires coordination with GM's information technology (IT) staff and rounds of testing and performance demonstrations. *Id.* ¶

2

22. From the dealers' perspective, the main difference between the two levels is that GM will subsidize the cost of using a premium product. *Id.* ¶ 21.

Vendors of an approved product enter a DTAP contract with GM under which the vendor agrees to adhere to GM's certification criteria. *See* Dkt. 53-1. The vendor then begins paying GM a recurring fee to participate in the program. Dkt. 53 ¶ 20. In exchange, GM lists the vendor's product on its Dealer Vendor Advisor website, where dealers can then purchase it along with the other certified CRM products listed on the site. *Id.* ¶ 16; Dkt. 53-1.

## B. Factual Allegations and Legal Claims in the Third Amended Complaint

CRMSuite states it became a DTAP-certified vendor in 2016 and remained as such until its termination from the program in the spring of 2020. Dkt. 53 ¶ 25. It gained certified status through an agreement with another certified vendor, iMagic Lab LLC. *Id.* ¶¶ 26–32. iMagic's CRM product, Dealer CRM, was approved for participation in the vendor program, and in August 2013 iMagic entered a DTAP contract with GM.[1] *See id.* ¶ 28. CRMSuite CEO Richard Latman signed the contract on behalf of iMagic and was apparently the CEO of both iMagic and CRMSuite at the time. *See* Dkt. 53-1 at 13. The contract was for an initial term of five years and gave GM the option to renew the agreement for two

---

[1] A copy of the contract is attached to the Third Amended Complaint. *See* Dkt. 53-1 ("Dealer Technology Assistance Program (DTAP) Agreement").

additional one-year terms by providing iMagic with written notice of renewal 90

days before the expiration of the initial term or the expiration of the first renewal

term. Dkt. 53-1 (DTAP Agreement, §§ I, XV).

In 2015, iMagic transferred the rights to its pipeline, its Dealer CRM

software, and its DTAP contract to CRMSuite.[2] Dkt. 53 ¶ 32. After the assignment,

CRMSuite renamed iMagic's software "CRMSuite," and GM updated the product

name on the vendor site at Latman's request. *Id.* ¶¶ 33, 35–37. CRMSuite

continued using the iMagic pipeline until March 2018. *Id.* ¶ 40.

In November 2017, CRMSuite entered a reseller relationship with Dominion

Dealer Services, LLC. *Id.* ¶ 41. As part of the arrangement, Dominion received the

right to sell CRMSuite's software under a new product label called "Vision

powered by CRMSuite." *Id.* ¶ 42. Dominion planned for the new Vision product to

replace its own CRM product, Autobase. *Id.* ¶¶ 42–44. For convenience,

CRMSuite shifted its customers to Dominion's pipeline. That way CRMSuite and

Dominion would not have to maintain two pipelines and could pay one vendor fee

to GM. *Id.* ¶¶ 45–48.

---

[2] At this stage the Court recites these facts as Plaintiff has alleged them. Many of them are in
dispute. Since filing the Third Amended Complaint, CRMSuite has produced an "Asset
Purchase, Sale, and Transfer Agreement" between it and iMagic. Under the agreement, iMagic
assigned to CRMSuite all its rights under contracts it was party to that were assignable without a
third party's consent, and CRMSuite agreed to assume all iMagic's duties under those same
contracts. Dkt. 70-1 at 3 (§ 1.2(a)).

GM approved this shared pipeline arrangement. *See* Dkt. 53 ¶¶ 49–51; Dkts. 53-3; 53-4. But in exchange for the two vendors paying a single fee, GM mandated that CRMSuite upgrade its software to include the eight additional functions required of premium-level products. Dkt. 53 ¶ 56. Around this same time, GM allegedly renewed for the first additional one-year term the DTAP contract iMagic had assigned to CRMSuite.[3] *Id.* ¶ 55.

With Dominion's assistance, CRMSuite began adding and integrating the new premium-level functions, several of which were in turn approved by GM's IT staff. *Id.* ¶¶ 60–61. Throughout the process of upgrading its software, CRMSuite claims that GM's IT staff repeatedly promised, during telephonic meetings and in emails, that its software would be approved at the premium level once the required upgrades were completed. *Id.* ¶ 58–61. During the integration process, GM also renewed CRMSuite's DTAP contract for a second time. *Id.* ¶ 62.

Sometime in early 2020, Dominion and CRMSuite agreed to end their business relationship. *See id.* ¶¶ 67–68. Dominion informed GM of this and that it would be transferring its Vision customers to CRMSuite. *Id.* ¶¶ 69–70. After learning this, GM cut off all communication with CRMSuite and canceled testing for the functions still needing validation. *Id.* ¶¶ 71–80. GM also contacted

---

[3] CRMSuite has not produced any written renewal agreement or any other written agreement between it and GM.

CRMSuite's dealer customers to inform them that CRMSuite was not a certified product and would not be certified in the future. *Id.* ¶ 76. GM also instructed its dealers to cancel their contracts with CRMSuite and switch to a DTAP-certified provider in order to keep receiving sales leads and bonuses. *Id.* ¶ 89.

CRMSuite's efforts to reconcile its relationship with GM failed, and its software went offline when Dominion closed its pipeline in May 2020. *Id.* ¶¶ 70– 77, 134.

Based on these alleged facts, CRMSuite's Third Amended Complaint asserts four counts: (Count I) a violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA); (Count II) breach of the DTAP contract; (Count III) promissory estoppel as an alternative to the breach of contract claim; and (Count IV) a promissory estoppel claim related to the efforts toward premium certification. Dkt. 53 ¶¶ 110–45. GM moves to dismiss the complaint for failure to state a claim.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff need not recite "detailed factual allegations," but must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* A

pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering the motion, courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citation omitted). Likewise, the Court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted). But the Court "need not accept factual claims that are internally inconsistent; facts which run counter to facts of which the court can take judicial notice; conclusory allegations; unwarranted deductions; or mere legal conclusions asserted by a party." *Anthony Sterling, M.D. v. Provident Life & Accident Ins. Co.*, 519 F. Supp. 2d 1195, 1208 (M.D. Fla. 2007).

### III. DISCUSSION

The Court will first address the breach of contract and promissory estoppel claims because the factual allegations undergirding these claims double, in part, as the unfair and deceptive acts that are the basis for the FDUTPA claim.

## A.  Count II: Breach of the DTAP Contract

CRMSuite asserts a breach of contract claim against GM Holdings. To state a claim for breach of contract under Michigan law, a plaintiff must allege that "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach."[4] *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 829 (Mich. 2016). CRMSuite claims it became party to a DTAP contract when iMagic assigned to it iMagic's rights under the existing DTAP contract between iMagic and GM Holdings. Once the initial term of that contract expired, CRMSuite claims that GM Holdings renewed the contract for two more one-year terms. GM then breached the agreement by terminating CRMSuite from the vendor program without written notice, which the contract required, during the second renewal period in February 2020. Dkt. 53 ¶¶ 28–32, 62, 122–27. GM asserts that CRMSuite has failed to plead the first and third elements required to state a claim. Dkt. 59 at 9–15, 19–20. The Court agrees.

Regarding the first element, the Court agrees, as it must at this stage, that iMagic assigned its DTAP contract to CRMSuite. The DTAP contract was active when the transfer agreement between CRMSuite and iMagic was executed, and the

---

[4] The DTAP contract provides that the agreement should be construed according to Michigan law. *See* Dkt. 53-1 at 10 (DTAP Agreement, § XVII). CRMSuite's promissory estoppel and FDUTPA claims, however, are governed by Florida law, *see Cadle v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1121 (11th Cir. 2016), and the parties have briefed their arguments accordingly, *see* Dkt. 59 at 15–19, 21–26; Dkt. 63 at 5–13, 16–20.

DTAP contract does not include an anti-assignment provision, meaning it was freely assignable under Michigan law. *See Jawad A. Shah, M.D., PC v. State Farm Mut. Auto. Ins. Co.*, 920 N.W.2d 148, 158 (Mich. Ct. App. 2018). The contract's initial five-year term expired in 2018. Dkt. 53-1 at 8. The contract states that GM may renew the agreement "for the number of additional terms as set forth in Agreement," here, two additional one-year terms, "upon written notice to the Service Provider not later than 90 days before the expiration of the Initial Term or any Renewal Term." Dkt. 53-1 at 8 (DTAP Agreement, § XV). GM's providing written notice was therefore a condition precedent for renewing the contract. Counsel for CRMSuite acknowledged this fact at the hearing on this motion and stated that GM never provided written notice or otherwise renewed the contract in writing.[5] By admitting this, CRMSuite conceded that the condition precedent for renewing the contract did not occur. Thus, CRMSuite did not have an enforceable contract with GM in February 2020—when the alleged breach occurred.[6] *Rodgers*

---

[5] The following is the relevant exchange between the Court and counsel for CRMSuite:

> **The Court:** Right. And Article 15 of the DTAP contract, which you've attached as Exhibit A, requires written renewals, right, in writing.

> **CRMSuite's Counsel:** It calls for a written renewal, your Honor. There was no written renewal . . . .

Hr'g Tr. at 11:20–24.

[6] Statements of counsel made at oral argument are often considered admissions that bind the represented party. *See, e.g., Yagman v. Allianz Ins.*, LA CV15–00921 JAK (JCx), 2015 WL 5553462, at *3 (C.D. Cal. July 9, 2015) ("Plaintiff's statement at the hearing on the motion to dismiss the FAC is deemed a judicial admission."); *Halifax Paving, Inc. v. U.S. Fire Ins. Co.*, 481 F. Supp. 2d 1331, 1336 (M.D. Fla. 2007) ("Statements made by an attorney during oral

*v. JPMorgan Chase Bank NA*, 890 N.W.2d 381, 386 (Mich. Ct. App. 2016)

("[B]ecause the express conditions precedent to the formation of the contract were

not fulfilled, the contract never came into existence and is consequently not

enforceable.").

But even assuming a valid contract and breach, CRMSuite's claim still fails

because its alleged damages—lost profits and costs incurred to upgrade its

software—are not recoverable under the contract's terms. Section XXI of the

claimed DTAP agreement titled "Remedies; Limitation of Liability" bars recovery

of consequential or indirect damages for all claims related to the agreement:

> [N]either GM nor the Service Provider shall be liable to the other for
> any direct damage arising out of or relating to this Agreement, whether
> based on an action or claim in contract, equity, negligence, tort
> (including strict liability) or otherwise, for events, acts or omissions in
> an aggregate amount in excess of three times (3x) the contract value,
> and subject to the exclusions set forth below, **neither party shall be
> liable to the other party for consequential, incidental, special
> (including multiple or punitive) or other indirect damages that
> arise out of or are related to performance under this Agreement**,
> **whether based on an action or claim in contract, equity, negligence,
> tort (including strict liability) or otherwise.**

Dkt. 53-1 at 10 (emphasis added).

---

argument are binding judicial admissions and may form the basis for deciding summary
judgment."); *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002) ("The verbal
admission by [defendant's] counsel at oral argument is a binding judicial admission, the same as
any other formal concession made during the course of proceedings."); *cf. Crowe v. Coleman*,
113 F.3d 1536, 1542 (11th Cir. 1997) (noting unambiguous concessions of counsel made during
appellate oral argument can count against the represented party).

Section XVI "Termination for Convenience" further specifies that GM is not liable for the vendor's lost profits or product development costs resulting from the termination of the agreement:

> In addition to any other rights of GM to terminate this Agreement, GM may, at its option, immediately terminate all or any part of this Agreement, at any time and for any reason, by giving written notice to Service Provider. Upon termination by GM, GM shall not be liable for and shall not be required to make payments to Service Provider, directly or on account of claims by Service Provider's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, **product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this Agreement.**

Dkt. 53-1 at 8 (emphasis added).

Read together these provisions allow suits for direct damages, but bar consequential damages—specifically lost profits—and damages for "product development and engineering costs." As these are the only damages alleged in the complaint, CRMSuite cannot plead damages. Because of this and because GM never renewed iMagic's initial DTAP contract after it was assigned to CRMSuite, Count II is dismissed.

### C. Count III: Promissory Estoppel as an Alternative to Breach of Contract

CRMSuite's third count asserts promissory estoppel as an alternative to its breach of contract claim. To state a claim for promissory estoppel, CRMSuite must allege (1) a promise made by the defendant; (2) "which the promisor should

reasonably expect to induce action or forbearance on the part of the promisee," (3) that in fact induced such action or forbearance, and that (4) "injustice can be avoided only by enforcement of the promise." *See W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989) (quoting Restatement (Second) of Contracts § 90 (1979)). CRMSuite claims that by listing its product on the vendor advisor site and delivering sales leads to its dealer customers, GM promised CRMSuite that its product was approved and would remain available to GM dealers through the vendor program. *See* Dkt. 53 ¶¶ 131–32. Relying on this promise, CRMSuite says it "changed its position" and began selling its software to GM dealerships. *Id.* ¶¶ 133–35.

There are a few problems with this theory. First, CRMSuite does not identify an actionable promise. To succeed in a claim for promissory estoppel, a plaintiff must show that it relied on the defendant's affirmative promise that was "sufficiently definite in time or term or reasonableness." *W.R. Grace & Co.*, 547 So. 2d at 925; *Vencor Hosps. v. Blue Cross Blue Shield of R.I.*, 284 F.3d 1174, 1185 (11th Cir. 2002). GM's listing CRMSuite on the vendor site was not such a promise. If anything at all, the listing permitted that the product was available for dealers to purchase at that time. GM's staff never told CRMSuite that its product would remain on the site for a year, a month, or even a week. *See W.R. Grace & Co.*, 547 So. 2d at 924–25; *Hygema v. Markley*, 187 So. 373, 380 (Fla. 1939)

12

(rejecting promissory estoppel claim because the promise relied on "was entirely indefinite as to terms and time").

Any belief that its product would remain approved indefinitely was also unreasonable given what CRMSuite knew about the vendor program. The company CEO, Mr. Latman, signed the DTAP contract attached to the current complaint (the contract iMagic assigned to CRMSuite). *See* Dkt. 53-1. The contract's terms set the rules for the vendor program and make clear that GM can terminate DTAP vendors or decertify products for any reason at any time with almost no recourse. *See* Dkt. 53-1 (DTAP Agreement, § XVI). Nothing in the agreement's terms suggests that a product's being listed on the vendor site gives any future assurances or connotes indefinite approval. Latman, as a signatory to the contract, and by extension CRMSuite, understood this. *See Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1351 (S.D. Fla. 1999) ("[R]eliance on promises specifically contradictory to a written agreement is unjustified as a matter of law." (cleaned up)). With no definite promise or reasonable reliance thereupon, Count III fails.

### D. Count IV: Promissory Estoppel related to Premium-Level Certification

Count IV, however, states a claim for relief regarding CRMSuite's pursuit of premium certification. According to the complaint, GM's IT staff promised CRMSuite, in multiple telephonic meetings and emails at discrete steps of the

certification process, that its product would be certified at the premium level if it completed the required integrations. Dkt. 53 ¶ 59. Relying on these assurances, CRMSuite claims it spent $300,000 to make the needed upgrades, only for GM to cancel the final validation testing and refuse to grant premium certification. *Id.* ¶¶ 64–72. Taken as true, these allegations recite the elements of a promissory estoppel claim.

GM argues to the contrary that these allegations as plead are insufficient. As in Count III, GM asserts that Count IV has not identified an actionable promise. The promises CRMSuite relies on were reflected in unspecified verbal statements on unspecified dates, making them indefinite. GM also argues that the facts alleged do not show that CRMSuite changed its position based on any representations GM made. Rather, CRMSuite agreed to upgrade its software and incur the related expenses in exchange for being allowed to share a pipeline with Dominion and pay a single vendor fee. In fact, GM contends that the emails CRMSuite has attached to the complaint that convey some of the supposed promises GM's IT staff made during the certification process were sent after CRMSuite had begun adding the premium functions to its software, meaning these supposed promises could not have induced any reliance. Dkt. 59 at 24–26.

GM's points are unavailing at this stage. First, when asserting a standard promissory estoppel claim, as Count IV does, a plaintiff must allege that the

defendant made an affirmative and definite promise. But the plaintiff is not held to the heightened pleading standard that applies to claims sounding in fraud, meaning the plaintiff is not required to recite the who, what, when, where, and how of the circumstances surrounding the promise. *See, e.g.*, *Christian Tennant Custom Homes of Fla., Inc. v. EBSCO Gulf Coast Dev., Inc.*, No. 15-cv-585-MCR-CJK, 2016 WL 11511584, at *6 (N.D. Fla. Aug. 26, 2016) (declining to apply heightened Rule 9(b) pleading standard to a conventional promissory estoppel claim). So, here, alleging that GM's IT staff promised premium certification if CRMSuite added the required functions, which the complaint alleges, will suffice.

Next, GM's inducement argument fails because it frames things incorrectly. GM focuses on the fact that it did not force CRMSuite to upgrade its software because CRMSuite voluntarily agreed to add the premium functions as part of its shared-pipeline arrangement with Dominion. Yet this overlooks the allegation that GM still promised to certify CRMSuite at the premium level if it completed the upgrades—a promise CRMSuite claims it then relied on in deciding to upgrade its software. Dkt. 53 ¶¶ 90–92, 141–43. This is quintessential detrimental reliance.

As for the promises being made before CRMSuite began upgrading its software, CRMSuite cited the specific emails referenced in and attached as exhibits to the complaint as examples of the types of assurances GM made—both orally during "kick off" meetings and in emails—throughout all stages of the certification

15

process. Dkt. 53 ¶¶ 57–61; Dkt. 53-7. It is only plausible then that some of these promises occurred before CRMSuite began making the necessary upgrades, just as the complaint suggests. As a result, GM's arguments fail, and the Motion is denied as to Count IV.

### E. Count I: FDTUPA Violation

CRMSuite also claims its termination from the vendor program violated the Florida Deceptive and Unfair Trade Practices Act. The statute proscribes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204 (2019). To seek damages under FDUTPA, a plaintiff must establish: "(1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." *State v. Beach Blvd Auto. Inc.*, 139 So. 3d 380, 393 (Fla. 1st DCA 2014). An unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (cleaned up). A deceptive act occurs "if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Id.* (cleaned up). Whether conduct is unfair or deceptive is a question of fact. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA

2010). And courts are to construe both terms liberally. *See* Fla. Stat. § 501.202 (2019).

GM argues that CRMSuite has failed to plead any of the required elements of a FDUTPA claim. GM focuses mainly on the first element by claiming that none of the actions cited in the complaint amount to unfair or deceptive conduct.

The Court, however, finds that CRMSuite has pled a prima facie FDUTPA claim based on a theory of harm similar to that alleged in Count IV—that GM induced CRMSuite to expend significant resources in pursuit of premium certification, though never intending, and ultimately refusing, to grant premium certification. *See* Dkt. 53 ¶ 118 (a, c). Given the liberal nature in which courts must construe what is an unfair or deceptive act or practice under the statute, this alleged inducement falls within the range of actionable conduct.[7] And the expenses CRMSuite claims it incurred based on GM's representations appear sufficient to constitute actual damages recoverable under the statute.[8] The Motion to Dismiss is therefore denied as to Count I.

---

[7] The unfair and deceptive acts alleged under Count I based on GM's actions following the cancellation of CRMSuite's final validation testing are not actionable. These actions include GM's informing its dealerships that CRMSuite was not certified and instructing the dealerships to cancel their contracts with CRMSuite in order to continue receiving sales leads and bonuses. *See* Dkt. 53 ¶ 118 (d–g). These actions were simply examples of GM exercising its authority to run its vendor program according to its own standards outlined in the DTAP contract.

[8] The measure of damages for a traditional consumer claim under FDUTPA is "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200, 1204 (Fla. 1st DCA 2012) (cleaned

## IV. CONCLUSION

For the foregoing reasons, Defendant General Motors' Motion to Dismiss (Dkt. 59) is **GRANTED** as to Counts II and III and **DENIED** as to Counts I and IV. If it wishes, Plaintiff may file a clean complaint within 14 days of the issuance of this order.

**DONE AND ORDERED** at Tampa, Florida on March 10, 2021.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record

---

up). Since FDUTPA also extends to unfair acts between business entities outside a direct consumer context, the damages in these non-traditional cases are typically those directly caused by the unfair or deceptive acts. *See, e.g.*, *Glob. Tech Led, LLC v. Hilumz Int'l Corp.*, No. 15-cv-553-FTM-29CM, 2017 WL 588669, at *9 (M.D. Fla. Feb. 14, 2017) (finding that past lost profits resulting from the defendant's alleged unfair actions were proper damages under FDUTPA where the alleged unfair conduct occurred between two competing businesses); *see also Marco Island Cable v. Comcast Cablevision of the S., Inc.*, 312 F. App'x 211, 214 (11th Cir. 2009) (per curiam) (affirming actual damages awarded in FDUTPA action for lost anticipated profits where evidence of plaintiff's historical performance established that defendant's anticompetitive conduct diminished the value of plaintiff's business).

18