## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CRMSUITE CORPORATION, a
Florida corporation,

      Plaintiff,

v.                                                              Case No: 8:20-cv-762-WFJ-AAS

GENERAL MOTORS COMPANY,
a Delaware corporation; GENERAL
MOTORS, LLC; a Delaware limited
liability company; and GENERAL
MOTORS HOLDINGS LLC, a
Delaware limited liability company,

      Defendants.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendants General Motors
Company, General Motors, LLC, and General Motors Holdings LLC's
(collectively, "GM") Motion for Summary Judgment, Dkt. 110. Plaintiff
CRMSuite Corporation filed a response, Dkt. 120. The Court received cogent oral
argument from the parties on February 16, 2022, followed by invited supplemental
filings, Dkts. 133 & 134. Upon careful consideration, the Court grants Defendants'
motion.

# BACKGROUND

## I.     GM's Software Certification Program

As set forth in this Court's previous order, Dkt. 71, this case arises from a dispute between Plaintiff and GM regarding GM's Dealer Technology Assistance Program/Dealer Vendor Management Program ("DTAP/DVMP"). Through DTAP/DVMP, GM certifies third-party vendors' customer relationship management ("CRM") software products. Dkt. 53 ¶ 15. CRM software allows dealers to manage customer leads, including those generated through dealers' websites. *Id.* ¶ 10. A list of DTAP/DVMP-certified CRM products that are available for purchase by GM dealers is displayed on GM's Dealer Vendor Advisor website. *Id.* ¶ 16. Unless a GM dealer purchases a CRM software product from a GM-approved vendor, GM will not provide customer leads, related data, or performance bonuses to the dealer. *Id.* ¶ 18.

To become a GM-approved vendor, a CRM vendor must meet several technical standards and requirements. Dkt. 53-1 at 3. Among these requirements is the vendor's need to integrate a connector server to act as a data communications pipeline between its CRM software and GM's computer network. Dkt. 53 ¶ 19. GM uses this pipeline to deliver the leads, data, and bonuses to dealers. *Id.* ¶¶ 18−19. A vendor must also pay a recurring fee to GM to participate in the vendor program. *Id.* ¶ 20. While all CRM vendors must use a pipeline and pay a vendor

fee, other certification requirements differ depending on the level of certification a vendor pursues. *Id.* ¶¶ 21−22. GM offers two certification levels: basic and premium. *Id.* ¶ 21. Unlike basic-level certification, premium-level certification allows the vendor's dealer customers to receive subsidies from GM to cover the cost of purchasing the CRM product. *Id.* However, obtaining premium certification requires substantial time and expense, as a vendor must add eight additional functions to its software product. *Id.* ¶ 22. Adding these eight functions, which are unique to GM's systems, requires vendors to work with GM's information technology ("IT") staff and participate in testing and demonstrations of the functions. *Id.* ¶¶ 22−23.

In addition to obtaining certification under DTAP/DVMP, a vendor seeking to participate in GM's vendor program must enter into a DTAP/DVMP contract with GM. *See* Dkt. 53-1. The DTAP/DVMP contract requires vendors to adhere to the aforementioned certification criteria. *Id.* at 3.

## II.    Factual Allegations

Plaintiff is a Florida-based corporation that provides CRM software to automobile dealers, including dealers who sell GM vehicles. *Id.* ¶¶ 10, 12. Plaintiff states that its CRM product, CRMSuite, was DTAP/DVMP-certified and available for dealers to purchase through GM's vendor program from 2016 until 2020. *Id.* ¶ 25. Plaintiff's CRMSuite product was originally owned by iMagic Lab LLC

3

("iMagic"), which called the product "Dealer CRM." *Id.* ¶ 26; *see* Dkt. 53-2.
iMagic's CEO was Richard Keith Latman, who is also Plaintiff's CEO and
president. Dkt. 111 ¶¶ 2, 19; Dkt. 121 ¶¶ 2, 19. iMagic created a pipeline and
obtained premium-level certification for its Dealer CRM product. Dkt. 53 ¶¶ 27,
31. In August 2013, iMagic also executed a freely assignable DTAP/DVMP
contract. Dkt. 53-1. The iMagic contract had an initial term of five years and gave
GM the option to renew the contract for two additional one-year terms by
providing written notice to iMagic ninety days prior to the expiration of either the
initial term or first renewal term. *Id.* §§ I, XV. The certified Dealer CRM product
was available for purchase through GM's vendor program beginning in 2013. Dkt.
53 ¶ 31.

In 2015, iMagic transferred its rights under the DTAP/DVMP contract,
including its Dealer CRM product and pipeline, to Plaintiff. *Id.* ¶ 32. After the
transfer, Plaintiff changed the Dealer CRM product name to CRMSuite. *Id.* ¶ 33.
GM updated the Dealer Vendor Advisor website to reflect the product's name
change at Mr. Latman's request. *Id.* ¶¶ 35−37. Plaintiff used iMagic's transferred
pipeline for its CRMSuite product until 2018. *Id.* ¶ 40.

In November 2017, Plaintiff entered into a reseller agreement with
Dominion Dealer Services, LLC ("Dominion"). *Id.* ¶ 41. At this time, Dominion
already had a DTAP/DVMP contract with GM that covered its DTAP/DVMP-

4

certified CRM product called Autobase. Dkt. 111 ¶¶ 56−57; Dkt. 121 ¶¶ 56−57.

Under the reseller agreement, Plaintiff exclusively licensed to Dominion the "right

to market, sell, distribute and/or sublicense" Plaintiff's CRM software—"referred

to as CRMSuite"[1]—for a five-year term under a white label.[2] Dkt. 79-9 ¶¶ 2.1(a,

e), 7.1. The reseller agreement's "cross-over date" upon which Plaintiff could no

longer market, sell, distribute, and/or sublicense CRMSuite was April 18, 2018.

Dkt. 111 ¶¶ 48−49; Dkt. 121 ¶¶ 48−49. Plaintiff retained the right to support

subscriptions of its existing CRMSuite dealer customers. Dkt. 111 ¶ 46; Dkt. 121 ¶

46. Dominion agreed to incorporate the language "powered by CRMSuite" in the

name of the white label product, ultimately calling the product "Vision powered by

CRMSuite." Dkt. 53 ¶ 42; Dkt. 121 ¶ 59. Per the terms of the reseller agreement,

Dominion was to pay Plaintiff a license fee of $5 million, and Plaintiff agreed to

perform original equipment manufacturer ("OEM") integrations at Dominion's

request for no extra cost. Dkt. 79-9 ¶¶ 3.4, 5.1.

The parties agree that, roughly one month after executing the reseller

agreement, Dominion asked GM whether it could replace its certified Autobase

product with a white label version of Plaintiff's CRM software. Dkt. 111 ¶ 64; Dkt.

---

[1] Dkt. 79-9 at 28.
[2] "'White-label' products are versions sold without branding so the purchasing entity can brand the product itself." *CEATS, Inc. v. Cont'l Airlines, Inc.*, 526 F. App'x 966, 968 (Fed. Cir. 2013). While Plaintiff denies that this was a white label arrangement, Dkt. 122 ¶ 59, the reseller agreement and multiple emails specifically use the term "white label." *See* Dkt. 79-9 ¶ 2.1(e); Dkt. 111-4 at 2, 224; Dkt. 121-18 at 7.

121 ¶ 64. Shortly after, in January 2018, GM initiated a DTAP change request to update Dominion's DTAP/DVMP contract to allow Dominion to work with subcontractors. Dkt. 111 ¶ 67; Dkt. 121 ¶ 67; Dkt. 111-4 at 235−36. GM also updated Dominion's DTAP/DVMP contract to cover the new "Dominion Vision" product. Dkt. 111 ¶ 71; Dkt. 121 ¶ 71.

Because Dominion already had a pipeline for Autobase, Plaintiff shifted its CRMSuite product customers to Dominion's pipeline. Dkt. 53 ¶¶ 44−45. By sharing this pipeline, Plaintiff and Dominion could avoid maintaining two separate pipelines and only needed to pay one vendor fee to GM. *Id.* ¶¶ 45−48. GM approved Plaintiff and Dominion's pipeline-sharing arrangement, and Dominion paid the shared vendor fees. *See id.* ¶¶ 49−51; Dkt. 53-3; Dkt. 53-4. Plaintiff alleges that in exchange for approving the shared vendor fee and pipeline arrangement, GM required Plaintiff to upgrade its CRMSuite product to include the eight additional functions required of premium-level products. Dkt. 53 ¶ 56.

Plaintiff asserts that, around this time, GM renewed the assigned iMagic DTAP/DVMP contract for the first additional one-year term. *Id.* ¶ 55. Plaintiff also contends that GM later renewed the iMagic contract for the second additional one-year term. *Id.* ¶ 62. GM maintains that it never renewed the iMagic contract after the initial term, as it found Mr. Latman, CEO of both iMagic and Plaintiff, "difficult to work with and not forthright." Dkt. 111 ¶¶ 25−26. The parties agree,

however, that the iMagic contract was no longer in effect after March 31, 2018. Dkt. 110 at 4; Dkt. 128-1 at 10.

In early 2018, Plaintiff states that it began working with Dominion's assistance to integrate the eight premium-level functions into its CRMSuite product. Dkt. 53 ¶¶ 49, 63. According to Plaintiff, GM's IT staff repeatedly promised Plaintiff during telephonic meetings and in emails that its CRMSuite product would be certified at the premium level following the completed integration of the eight functions. *Id.* ¶¶ 58−61. Plaintiff also claims that a Dominion employee, John Hardacre, acted with apparent authority to make affirmative promises of certification on GM's behalf. *Id.* ¶¶ 50−52. GM counters that it never represented that it would certify Plaintiff's CRMSuite product, nor did Mr. Hardacre act as its agent. Dkt. 110 at 10, 13 n.14. GM further asserts that the entities were not integrating the CRMSuite product but were instead integrating Dominion's white label Vision product. *Id.* at 12.

Conflict arose between GM and Plaintiff in early 2020 when Plaintiff and Dominion agreed to terminate their reseller agreement. Dkt. 53 ¶¶ 68, 71. Dominion informed GM of this termination and the agreement between Dominion and Plaintiff for Vision customers to become direct customers of Plaintiff's CRMSuite product, which would no longer be exclusively licensed to Dominion. *Id.* ¶¶ 69−70.

GM thereafter cut off all communication with Plaintiff and canceled the remaining testing scheduled for premium-level functions still needing validation. Dkt. *Id.* ¶¶ 71−80. At that point, GM's IT staff had only tested and approved one of the eight required functions. Dkt. 111 ¶¶ 84−85; Dkt. 121 ¶¶ 84−85. GM also contacted Plaintiff's dealer customers to inform them that Plaintiff's CRMSuite product was not certified and would not be certified in the future. Dkt. 53 ¶ 76. GM instructed these dealers to cancel their contracts with Plaintiff and find a DTAP/DVMP-certified CRM vendor to continue receiving customer leads, data, and bonuses. *Id.* ¶¶ 76, 89.

Though Dominion planned to sunset Autobase and close its pipeline in March 2020 in anticipation of the Vision product's certification, Dominion agreed to extend the Autobase pipeline's shutoff date to afford Plaintiff additional time to convince GM to continue the certification process. *Id.* ¶¶ 67, 77; Dkt. 111-2 at 8. Plaintiff attempted to reconcile its relationship with GM to no avail, and its CRMSuite product went offline when Dominion closed its Autobase pipeline around June 2020. Dkt. 53 ¶¶ 78−81; Dkt. 111 ¶¶ 99−100; Dkt. 121 ¶¶ 99−100.

Based on these alleged facts, Plaintiff filed its Third Amended Complaint, Dkt. 53, before this Court. GM moved to dismiss that four-count complaint for failure to state a claim. Dkt. 59. This Court granted GM's motion in part, dismissing the Count II breach of contract claim and Count III promissory estoppel

claim brought as an alternative to breach of contract. Dkt. 71. Remaining before the Court are Plaintiff's Count I[3] claim alleging a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and Count IV claim alleging promissory estoppel regarding premium-level certification. Dkt. 53 ¶¶ 110−20, 137−45. Both remaining claims are based on the theory that GM induced Plaintiff to expend significant resources to obtain premium-level certification without ever intending, and ultimately refusing, to grant such certification. Dkt. 71 at 17. GM now moves for summary judgment.

### LEGAL STANDARD

A district court should grant summary judgment only when it determines that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it is a legal element of the claim that might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record, in its entirety, could lead a rational trier of fact to find for the nonmovant. *Id.* The moving party bears the burden of demonstrating that no

---

[3] As this Court held in its previous order, however, Plaintiff's Count I allegations pertaining to purported unfair and deceptive acts by GM occurring *after* the cancellation of CRMSuite's final validation testing, such as GM's instructions to Plaintiff's dealer customers to find new CRM software vendors, are not actionable. Dkt. 71 at 17 n.7.

genuine issue of material fact exists. *Id.*

In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004). Upon doing so, the court must determine whether a rational jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the inferences arising from undisputed facts, a court should deny summary judgment. *Allen*, 121 F.3d at 646.

## ANALYSIS

### I.    Count I: FDUTPA Violation

Plaintiff contends that GM violated FDUTPA by inducing Plaintiff, a consumer of GM's vendor program, to incur substantial time and expense in integrating several functions into its CRMSuite product through promises of premium-level certification despite having no intention to ever certify the product. Dkt. 53 ¶ 118 (a, c). FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To recover damages under FDUTPA, a plaintiff must show: "(1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." *State v. Beach Blvd Auto. Inc.*, 139 So. 3d 380,

393 (Fla. 1st DCA 2014).

GM asserts that it is entitled to summary judgment because Plaintiff cannot establish any of these three elements. Dkt. 110 at 9. Regarding the first element, GM contends that at least four undisputed facts show that Plaintiff cannot establish a deceptive act or unfair practice by GM. *Id.* at 10. First, GM stresses that it never made an affirmative promise of premium certification to Plaintiff. *Id.* Second, GM states that offering CRM products through DTAP/DVMP requires more of a vendor than just the technical integration of the eight functions. *Id.* at 10−11. GM states that a vendor also needs a DTAP/DVMP contract, which Plaintiff did not have. *Id.* at 11−12. Third, and relatedly, GM contends that Dominion's Vision product—not Plaintiff's CRMSuite product—was the software being integrated during the relevant time period. *Id.* at 12−13. Finally, GM states that it was not interested in contracting or working directly with Plaintiff. *Id.* at 13−15.

Plaintiff, however, claims that GM's false promises to certify CRMSuite constitute a deceptive act or unfair practice. Plaintiff contends that the evidence shows GM promised to certify a CRM product containing the term "CRMSuite" in its name. Dkt. 120 at 10−11. According to Plaintiff, it reasonably held the belief that GM was therefore certifying its CRMSuite product, not a product of Dominion. *Id.* at 12. Additionally, though Plaintiff did not have a DTAP/DVMP contract, it states that it reasonably expected to obtain one upon the complete

integration of the CRMSuite product. *Id.* at 11−12. While GM claims it was not interested in and had no intention of entering into a contract with Plaintiff, Plaintiff asserts that this fact is immaterial to its FDUTPA claim. *Id.* at 13.

Whether conduct is unfair or deceptive under FDUTPA is a question of fact. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). A deceptive action is "a representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances, to the consumers' detriment." *Beach Blvd Auto. Inc.*, 139 So. 3d at 387 (citing *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). An unfair action is one "that offends established public policy and one that is substantially injurious to consumers, unscrupulous, oppressive, unethical, or immoral." *Id.* at 386−87 (citing *PNR, Inc.*, 842 So. 2d at 777). Both terms are to be construed liberally. *See* Fla. Stat. § 501.202.

Here, Plaintiff's counsel conceded at the February 16th hearing that Plaintiff cannot identify one specific affirmative representation or promise of premium certification by GM. Plaintiff's counsel instead asserted that emails and deposition statements in the record amount to a clear promise of premium-level certification. *See* Dkt. 133 at 2−4. For example, Plaintiff points to several emails discussing the integration and certification of "CRMSuite." Dkt. 133 at 2−3. Plaintiff next posits that Mr. Hardacre, a Dominion employee, acted with apparent authority to make

affirmative representations and promises of certification on behalf of GM. Dkt. 53 ¶ 52. The Court disagrees.

Even when considering the evidence in the aggregate, there is no clear promise by GM to certify CRMSuite. While Plaintiff is correct that some emails in the record involve discussions between employees of GM, Dominion, and Plaintiff regarding the "CRMSuite" integration, Plaintiff fails to give the full picture. Three of the emails that Plaintiff cites for this proposition in its response to GM's motion, Dkt. 120 at 11, indisputably reference the Vision product and not simply CRMSuite. *See* Dkt. 121-13 (using the name "Dominion Vision powered by CRMSuite"); Dkt. 121-14 (discussing the "Dominion team" and its integration of "Vision"); Dkt. 121-15 (mentioning "Dominion Vision" in both the subject line and body of email). Though Plaintiff contends that a reasonable vendor in Plaintiff's position would have been deceived by GM's promises to certify a CRM product that included the name "CRMSuite," Dkt. 120 at 10−11, the underlying facts do not support this contention. By its own admission, Plaintiff knew that the CRM software that it exclusively licensed to Dominion would include "powered by CRMSuite" in its product name. Dkt. 121 ¶ 59. No reasonable vendor in Plaintiff's position would have been deceived by promises to certify "Vision powered by CRMSuite" under these facts.

Moreover, multiple emails upon which Plaintiff relies for this argument were

sent by Dominion employee Mr. Hardacre, not an employee of GM. Dkt. 133 at

2−3. While Plaintiff seeks to attribute statements of Dominion employee Mr.

Hardacre to GM based on apparent authority, this Court does not find that an

apparent agency relationship existed. Under Florida law, apparent agency exists

only upon a showing of the following: "(1) a representation by the purported

principal; (b) a reliance on that representation by a third party; and (c) a change in

position by the third party in reliance on the representation." *Mobil Oil Corp. v.*

*Bransford*, 648 So. 2d 119, 121 (Fla. 1995). Apparent authority "does not depend

on representations by the person claiming to be an agent or on the subjective belief

of the person dealing with the purported agent." *Fla. St. Oriental Med. Ass'n, Inc.*

*v. Slepin*, 971 So. 2d 141, 145 (Fla. 1st DCA 2007). GM contends that Plaintiff

cannot establish any representation of agency by GM, and this Court agrees.

Plaintiff states that GM represented that Mr. Hardacre was its agent by

joining meetings that Dominion invited Plaintiff to attend, giving Mr. Hardacre

documents to send to Plaintiff, and telling Plaintiff to run communications to GM

through Mr. Hardacre. Dkt. 120 at 10 n.10. The context of the parties' work does

not suggest that these actions were representations by GM of Mr. Hardacre's agent

status. Given that Dominion had a DTAP/DVMP contract covering the Vision

product and allowing for its use of third-party subcontractors, it is expected that

GM would communicate with Plaintiff through a Dominion employee during the

14

integration process. It is also expected that GM would attend meetings during the integration process pertaining to its own vendor program, regardless of whether Plaintiff was invited to attend by GM or Dominion. There is ultimately no evidence indicating that GM represented to the public that it exercised control over Mr. Hardacre. *See Vermeulen v. Worldwide Holidays, Inc.*, 922 So. 2d 271, 275 (Fla. 3d DCA 2006) (finding no apparent agency where no evidence existed of purported principal representing to public that it exercised control over purported agent). With GM having done nothing to lead a reasonable person to believe that Mr. Hardacre was its agent, no apparent agency relationship existed here.

Like the emails relied upon by Plaintiff, the cited deposition statements are equally unconvincing as to the existence of an affirmative representation or promise of certification by GM likely to deceive a reasonable vendor. While Plaintiff's CEO Mr. Latman testified that it was "General Motors that gave directly to [Plaintiff] the steps to become a premium certified vendor," Dkt. 128-1 at 24, he still could not identify a specific instance in which GM actually promised to certify Plaintiff's CRMSuite product at the premium level. Though Mr. Latman also testified that "there was never a Vision integration" because the only product being integrated was CRMSuite, Dkt. 128-2 at 23, emails in the record expressly discuss

the integration of the Vision product.[4]

Plaintiff also relies on the deposition testimony of its employee Patrick Geddie, who testified that at "kickoff" meetings "GM would instruct [Plaintiff] on how to . . . go about integrating CRMSuite with GM." Dkt. 111-5 at 34. Yet Mr. Geddie admitted that he did not recall any specific kickoff meetings, those in attendance, or when such meetings took place. *Id.* These deposition statements made by Plaintiff's CEO and employee ultimately do not reveal any affirmative promise of certification by GM.

Even if GM made an affirmative promise of certification, Plaintiff did not have the requisite DTAP/DVMP contract to participate in GM's vendor program. The only contract Plaintiff had with GM was the assigned iMagic contract that was no longer in effect after March 2018. According to GM, a DTAP/DVMP contract was a prerequisite to engaging in the integration process. Dkt. 110 at 11; Dkt. 111-2 at 453−54. While Plaintiff disagrees that it needed to obtain a contract *before* integration, it does not dispute that a contract is ultimately necessary to take part in GM's vendor program. Dkt. 120 at 11−12.

Dominion, unlike Plaintiff, already had a DTAP/DVMP contract covering both the Autobase product and the "Dominion Vision" product. Dkt. 111-3 at 18.

---

[4] *See, e.g.*, Dkt. 111-2 at 23−24; Dkt. 111-4 at 358, 378; Dkt. 121-8; Dkt. 121-10; Dkt. 121-13; Dkt. 121-18.

Pursuant to Plaintiff and Dominion's reseller agreement, Dominion had the exclusive license to market, sell, distribute, and/or sublicense Plaintiff's CRM software as the Vision product for an anticipated term of five years after the April 2018 cross-over date. Thus, prior to the early termination of the reseller agreement in February 2020, Plaintiff had no right to market, sell, distribute, or sublicense its CRMSuite product and could only support its existing customers' subscriptions. Based on Dominion's DTAP/DVMP contract covering "Dominion Vision," as well as Plaintiff's inability to sell the CRMSuite product while bound to the terms of its reseller agreement, Plaintiff could not have reasonably expected during the integration process that it would obtain its own DTAP/DVMP contract for the CRMSuite product. And without such a contract, Plaintiff could not partake in GM's vendor program to offer the CRMSuite product even if its product was certified.

Relatedly, the record reflects GM's clear lack of a desire to contract with Plaintiff. While Plaintiff contends that GM's supposed reluctance to work with Plaintiff is immaterial to its FDUTPA claim, to ignore this undisputed fact would be to ignore reality. It is uncontested that GM and Mr. Latman had a strained working relationship dating back to Mr. Latman's time as CEO of iMagic. Dkt. *See*

128-1 at 43. Mr. Latman acknowledged his own spotty history with GM.[5] He also admits that the strained relationship was due, at least in part, to iMagic's repeated failure to make timely payments of its vendor fees to GM. *Id.*; Dkt. 120 at 8 n.8. GM's uncontested dissatisfaction with its past contractual relationship with Mr. Latman lends credence to GM's position that it never promised to certify Plaintiff's CRMSuite product.

Ultimately, Plaintiff cannot establish that GM engaged in an unfair or deceptive practice in violation of FDUTPA. There has been no identification of an affirmative representation—individually or collectively—by GM of premium certification of the CRMSuite product. No vendor acting reasonably in Plaintiff's position would have been deceived by GM as Plaintiff alleges. Plaintiff did not have the necessary DTAP/DVMP contract, and GM was not interested in contracting directly with Plaintiff. Moreover, Dominion's DTAP/DVMP contract covered the "Dominion Vision" product, and Plaintiff did not have the right to sell, market, distribute, or sublicense its CRMSuite product during the integration process while the reseller agreement was in effect. Plaintiff accordingly fails to show a genuine dispute of material fact as to the existence of an unfair or deceptive

---

[5] On January 27, 2020, Mr. Latman emailed GM employee Anthony Fava stating, "I know we've had our differences over the years but I'd love to repair our relationship. I'm not as brash and crazy as I once was, maybe I can make a trip up there and we can start over?" Dkt. 111-7 at 84. About a week later, Mr. Latman sent another email to Mr. Fava saying, "All I'm asking for is a meeting and a chance to repair the damage I caused you." Dkt. 111-7 at 94.

act of GM.

Given that Plaintiff cannot establish that GM engaged in an unfair or deceptive practice, its Count I FDUTPA claim fails. With Plaintiff failing to establish an unfair or deceptive practice, the Court need not address the remaining FDUTPA elements of causation and actual damages. GM is entitled to summary judgment on Count I.

## II.     Count IV: Promissory Estoppel Related to Premium-Level Certification

The Court next turns to Plaintiff's Count IV promissory estoppel claim based on GM's alleged inducement of Plaintiff's pursuit of premium-level certification. Dkt. 53 ¶ 139. To bring a successful promissory estoppel claim, a plaintiff must prove (1) a promise made by a promisor, (2) "which the promisor should reasonably expect to induce action or forbearance on the part of the promisee," (3) that in fact induced such action or forbearance, and that (4) "injustice can be avoided only by enforcement of the promise." *See W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989) (quoting Restatement (Second) of Contracts § 90 (1979)). Moreover, "the promise must be 'definite, of a substantial nature, and established by clear and convincing evidence.'" *Swerhun v. Gen. Motors Corp.*, 812 F. Supp. 1218, 1221 (M.D. Fla. 1993) (quoting *W.R. Grace & Co.*, 547 So. 2d at 920); *see also W. Indies Network-I, LLC v. Nortel Networks, (CALA), Inc.*, 243 F. App'x 482, 485 (11th Cir. 2007) (citations omitted)

(explaining that "[p]romissory estoppel has no application unless the evidence is clear and convincing . . . and the terms of the promise are definite").

Plaintiff contends that, during telephonic meetings and through email, GM promised to Plaintiff that its product would be certified at the premium level once Plaintiff completed the required integrations. Dkt. 53 ¶ 59. GM, however, asserts that it is entitled to summary judgment on this claim because Plaintiff's promissory estoppel claim fails as a matter of law. Dkt. 110 at 20−21. GM first states that, like with the FDUTPA claim, Plaintiff has failed to sufficiently identify a single affirmative promise of certification made by GM. *Id.* at 21−22. Next, GM posits that Plaintiff has not established that it suffered any foreseeable detrimental reliance. *Id.* at 22−23. GM also contends that equities do not require any such promise's enforcement, as GM's decision not to do business with Plaintiff was commercially reasonable. *Id.* at 24. Finally, GM states that Plaintiff has failed to adequately identify the out-of-pocket expenses it seeks in the form of reliance damages. *Id.* at 24−25.

As explained in the Court's analysis of Plaintiff's FDUTPA claim, Plaintiff has not identified any specific affirmative promise by GM to certify its CRMSuite product at the premium level. In fact, Plaintiff admitted that it cannot identify a single affirmative promise. While Plaintiff points to various emails and deposition statements to assert that statements made in the aggregate amount to a promise of

20

certification, the Court determined above that these emails and statements—whether considered individually or collectively—do not amount to an affirmative promise of certification. There is ultimately no clear and convincing evidence that GM ever made such a promise. Thus, the Count IV promissory estoppel claim fails for the same reason as the Count I FDUTPA claim. With no showing of a promise with definite terms, the Court need not analyze the remaining elements of a promissory estoppel claim, as promissory estoppel has no application here. *See W. Indies Network-I, LLC*, 243 F. App'x at 485. GM is entitled to summary judgment on Count IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, Dkt. 110. Accordingly, the parties' respective motions to exclude expert testimony, Dkts. 108 & 109, are **DENIED AS MOOT**. The Clerk is directed to enter judgment accordingly and close the case.

**DONE AND ORDERED** at Tampa, Florida, on March 1, 2022.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record